**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 9:20-cv-80847-RJS**

THE GEO GROUP, INC. and
GEO TRANSPORT, INC.

                Plaintiffs,

v.

NETFLIX, INC.,

                Defendant.

_____/


**DEFENDANT NETFLIX, INC.'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Netflix, Inc. ("Netflix") hereby submits this memorandum of law in support of its motion to dismiss the complaint filed on behalf of Plaintiffs The GEO Group, Inc. ("GEO Group") and GEO Transport, Inc. ("GEO Transport," and collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs claim that Netflix's *Messiah* – an artistic expressive work indisputably protected by the First Amendment – infringes their trademarks and defames the professed pristine reputation of its immigrant detention centers and transportation services.  Plaintiffs' claims are based on massively distorted descriptions of the alleged "uses" of their names in *Messiah*, when in reality, as the Court can see for itself, the references at issue are either imperceptible or fleeting background material.  Plaintiffs' lawsuit is an affront to the First Amendment and an abuse of the Court system for Plaintiffs' own public relations stunt, for which Netflix seeks to recover its attorneys' fees pursuant to Florida Statute Section 768.295.[1]

*Messiah* is plot-driven fictional thriller that unravels the mystery surrounding a fictional character known as al-Masih.  In the television series' ten episodes, a CIA officer strives to determine if al-Masih is a miracle-worker possessing biblical powers, or a charlatan attempting to destabilize the government.

GEO Group is a real estate investment trust in the business of constructing and managing detention facilities for local, state and federal governments. GEO Transport, a subsidiary of GEO Group, provides transportation services to the GEO Group's detention facilities.

An actual review of the episodes in question reveals the frivolity of Plaintiffs' claims. While Plaintiffs present the Court with cropped, enlarged and touched up images plucked out of

---

[1] Netflix has simultaneously filed an anti-SLAPP motion.

context from *Messiah*, and have filed with the Court annotated versions of the episodes with bright red "LOOK HERE" arrows, conceding the "blink-and-you'll-miss-them" nature of the disputed images, the GEO name is, in fact, never uttered once in the episodes.[2]  Simply put, a barely legible "GEO" patch on a costume shoulder patch, or an image of a vehicle with "GEO" parked in a parking lot in a fictional work is not actionable.

Nonetheless, in flagrant disregard of the First Amendment protections afforded to expressive works, Plaintiffs assert defamation, trademark, and unfair competition claims under the Lanham Act, along with equivalent state law causes of action.  Specifically, GEO Transport has brought six claims against Netflix based on *two seconds* of episode three – in which a bus bearing the GEO Transport logo is seen among numerous other damaged vehicles and buildings in the aftermath of a tornado's destruction.  The episode says nothing about GEO Transport's business, and has nothing to do with immigrant detention facilities at all.

GEO Group has also brought six claims based on four snippets in episode four (which collectively total *twenty-six seconds*), where GEO Group's logo is allegedly visible.  The episode focuses on al-Masih's capture by the United States government, and the ensuing courtroom drama as to whether al-Masih will be deported.  In a handful of scenes, al-Masih is shown being transported by a Department of Homeland Security van (not a GEO van) to an unnamed facility, and once there, interrogated by the CIA officer.  GEO Group alleges that, in four scattered clips –

---

[2] Netflix respectfully submits that the Court review undoctored versions of the episodes at issue, which are the subject of Netflix's concurrent Motion Permitting the Conventional Filing of DVDs. For the Court's convenience, the full series of *Messiah* is being submitted on DVD (the "DVD Ex.").  The DVD Exhibit is incorporated by reference into Plaintiffs' Complaint.  In ruling on a motion to dismiss, the Court may consider: (1) any material attached to the complaint as an exhibit (2) materials incorporated by reference and (3) documents that, although not incorporated by reference, are integral to the complaint and (4) matters on which a court may take judicial notice. *See Day v. Taylor,* 400 F.3d 1272, 1276 (11th Cir. 2005); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322-23 (2007).

each spanning between three to nine seconds – its name or logos are used (alongside the logos of numerous government agencies and other background details designed to modernize *Messiah*'s plot) and, depicted in such a way as to cause GEO Group harm because these references somehow falsely state that GEO detains immigrants in "overcrowded overheated rooms with chain-link cages and deprives them of beds, bedding, sunshine, recreation and educational opportunities." (*See* Compl. ¶ 51). There is no such statement regarding GEO. Plaintiffs also do not articulate what "harm" or "damages" has befallen them as a result of these flickering glimpses – nor could they, as Plaintiffs do not sell goods or services to the public, but instead operate detention centers and related transportation services, with their biggest customer being the United States government. (*See id.* ¶ 15).

Plaintiffs' claims should be dismissed pursuant to well-established Eleventh Circuit precedent that protects creative fictional works against overly litigious corporations that wish to squelch artistic expression which does not square with their preferred, manicured self-image. Under the governing *Rogers* test (expressly adopted by the Eleventh Circuit), Plaintiffs' trademark and unfair competition claims fail as a matter of law because: (i) *Messiah* is an expressive work protected by the First Amendment; (ii) the momentary background use of Plaintiffs' logos in scenes depicting an immigrant detention center has artistic relevance to the work, and (iii) Netflix has not explicitly mislead anyone into thinking that Plaintiffs were involved in the production of the television show. Plaintiffs' state law claims fail for these same very reasons.

Plaintiffs' defamation claims also suffer from multiple fatal deficiencies. *First*, the defamation claim improperly lumps GEO Group and GEO Transport together in a transparent attempt to disguise that there is no statement in *Messiah* *at all* about GEO Transport in the two seconds its logo appears amid a montage of a town destroyed by a tornado, much less one that can

be construed as defamatory.  *Second*, GEO Group's defamation claim ignores the broader context of the episode in which the GEO Group's name or logo briefly appears (if anyone even perceives it).  When episode four of *Messiah* is assessed in context, as required under binding precedent, it becomes readily apparent that no ordinary viewer would perceive the brief scenes depicting an immigration detention facility involving numerous governmental agencies as "of and concerning" GEO Group specifically.

Plaintiffs' Complaint is a poorly-guised marketing ploy designed to whitewash real-life governmental findings of abuse,[3] a waste of this Court's time, and an untenable confinement of First Amendment values.  This Court should reject Plaintiffs' use of litigation to silence artistic endeavors that do not comport with their self-serving imagery, and dismiss Plaintiffs' Complaint in its entirety, with an award of attorneys' fees.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Netflix Releases *Messiah*, a Fictional Television Series.

*Messiah* is a ten-episode television show distributed by Netflix that ran for one season. (*See generally* DVD Ex.)  This fictional, plot-driven thriller focuses on the cat-and-mouse game between two characters: al-Masih (played by Mehdi Dehbi), a mysterious religious leader who quickly gains followers in the Middle East and the United States, and Eva Geller (played by Michelle Monaghan), a CIA officer charged with investigating al-Masih's past and his motives. (*See id.*)  *Messiah* imagines how the modern world would react to a messianic figure who seems to perform miracles and whose followers view him as a savior.  (*See id.*)  The show derives

---

[3] By way of example, in 2019, the Officer of Inspector General found inhumane conditions that violated ICE standards in two GEO detention centers that housed ICE detainees.  (Attached hereto as **Exhibit A** is the Declaration of James G. Sammataro ("Sammataro Decl.").  A true and correct copy of the Officer of Inspector General's report is attached as Exhibit 1 to the Sammataro Decl.).

dramatic tension from the ongoing mystery concerning al-Masih's past and Geller's quest to discover if he is a terrorist, a con man, or an actual miracle-worker.  (*See id.*)  Through its fictional narrative, *Messiah* explores themes about the nature and tolerance of religious beliefs and how governments react to religious movements.  Immigration policy and treatment of immigrants is hardly a focus of the plot.  (*See id.*)

The name "GEO" is never spoken by any character at any time in the series.  (*See id.*) Each episode ends with a disclaimer in the credits that "[t]he characters and events depicted in this program are fictitious.  No depiction of actual persons or events is intended." (DVD Ex., Disc 2, 01:31:34.)

> **B**.    **GEO Transport's Logo Appears Once, in a Two-Second Scene Showing Tornado Damage in Episode Three**.

GEO Transport's six claims derive entirely from the appearance of the name "GEO Transport" on a bus, which is the first reference to GEO in the series and "appears" for two seconds in episode three of *Messiah*.  The episode revolves around a small town in Texas, and the pastor of a local church fraught with desperation over his dwindling congregation.  (*See generally* DVD Ex., Disc 5.)  The pastor's desperation spurs his plan to secretly burn down his own church for the insurance proceeds, only for the plan to be interrupted by the tornado and the arrival of al-Masih, who appears to have saved his church from the tornado's destruction. (*See generally* DVD Ex., Disc 5.)

The CIA learns that al-Masih has mysteriously arrived in Texas, having been in Jordan hours before, and immediately dispatches a local agent to capture him.  (*See generally* DVD Ex., Disc 5.)  In a two-minute sequence, the audience is introduced to Department of Homeland Security agent Will Mathers, as he drives through rural Texas to inspect the miraculously spared church. (DVD Ex., Disc 5, 09:35-11:35.)  The sequence features several shots of the tornado's

devastating wake.   Among the wreckage are destroyed homes and dozens of ruined vehicles, including a damaged GEO Transport bus, which is perceptible, along with a host of other vehicles and destruction, for at most two seconds.  (Compl. ¶ 30; DVD Ex., Disc 5, 11:17-11:19.)  The shot of the damaged GEO Transport bus is immediately preceded by a shot of a firefighter walking among other destroyed vehicles, and immediately followed by a shot of Mathers pulling up to the wreckage surrounding the untouched church. (DVD Ex., Disc 5, 11:17-11:40.)

Preceding Shot                    Following Shot



The sequence ends with a dramatic aerial perspective showing the scope of the tornado's destruction, starkly contrasted with the still-standing church.  (DVD Ex., Disc 5, 11:38-11:52.)



Mathers then takes al-Masih into custody and detains him at a local sheriff's office.  (DVD Ex., Disc 5, 25:32-25:44.)  Episode 3 concludes *without* discussing or mentioning the GEO name.

The episode does not contain any discussion about GEO or immigrant detention centers and thus this first mention to GEO is untethered to any association whatsoever with GEO Transport's (or GEO Group's) business.  The two second glimpse of a bus bearing the "GEO Transport" name among the wreckage is the only time that GEO Transport appears on screen.

### C.    GEO Group's Name or Logo Appears in Four Barely Visible Snippets in Episode Four.

GEO Group's claims all derive from its allegation that its name or logo is visible four times in episode four of *Messiah*.  At the beginning of this episode, al-Masih is transported from the local sheriff's office to a detention facility in a van marked with a Department of Homeland Security logo. al-Masih spends the majority of the episode either in an Executive Office for Immigration Review courtroom, or sitting alone in the detention center.  (*See generally* DVD Ex., Disc 5.)  In one scene, al-Masih is interrogated at the detention center, not by a GEO employee, but by CIA officer Geller.  During the interrogation, Geller asks, "Are they treating you OK?" to which al-Masih responds "Yes, thank you."  (DVD Ex., Disc 5, 45:40-45:47.)  The GEO name or logo does not appear during any of the scenes where al-Masih is interrogated.[4]  In a surprise twist at the end of the episode, the immigration judge grants al-Masih asylum, freeing him from custody. (*See generally* DVD Ex., Disc 5.)

GEO Group complains of four fleeting uses of the GEO logo.  These four appearances are buried in the background; are never the focus of the scene; and range from approximately three to nine seconds each.  (Compl. ¶¶ 31-32.)  Of the four camera shots, two do not even depict how immigrants are housed at a detention center.  In one seven-second shot (DVD Ex., Disc 5, 41:00-

---

[4] The characters playing United States intelligence officers debate whether their strategic goals are best served by al-Masih being deported back to Israel, where Israeli intelligence wish to continue interrogating him, or keeping al-Masih in the United States, where domestic intelligence agencies could continue to monitor him.  (*See generally* DVD Ex., Disc 5.)

41:07), a car that bears the GEO Group logo is parked in a parking lot as the Department of Homeland Security van carrying al-Masih into the facility – which is clearly the focus of the shot – passes by.[5]  In another four-second shot (DVD Ex., Disc 5, 52:43-53:47), security guards with "GEO Group" patches on their arm escort al-Masih from the interrogation room down an empty hallway.[6]

There are only two shots that include "GEO" in the same frame as detained immigrants. In a nine-second shot (DVD Ex., Disc 5, 01:10:50-01:10:59), a security guard with a "GEO" arm patch and DOJ attorney both observe al-Masih on a security camera while he is alone in a cell, sitting peacefully.  And in a six-second shot (DVD Ex., Disc 5, 01:19-48-01:19:54), a security guard with a barely perceptible "GEO" patch is visible through a fan, while a crackling radio mentions that it is hot (contrary to GEO Group's characterization, there is no mention of whether or not the facility is air-conditioned).

The guards who wear the GEO patches on their costumes in episode four are listed in the credits as "Security Room Guard," not as "GEO Guard." (DVD Ex., Disc 5, 01:24:29.)  As was the case with episode three, the name "GEO" is never uttered in the fourth episode.  Aside from these fleeting displays in episode four, GEO Group's logo never appears in *Messiah* and, indeed,

---

[5] The image included at paragraph 31 of Plaintiffs' Complaint has been cropped and appears to use artificial color correction to make the GEO logo appear prominent.  An accurate, unaltered version of the shot, where the GEO logo is nearly indiscernible, is attached. (*Compare* Compl. Ex. A *with* Sammataro Decl., Ex. 2).  A review of the scene at issue reveals that the viewers' eyes are directed towards the opening gate and moving vans carrying the protagonist into the facility, and not the parked cars in the background.

[6] Plaintiffs' Complaint, perhaps purposefully, does not distinguish which shots feature the GEO Group logo as opposed to the GEO Transport logo.  Even though the image in paragraph 31 of the Complaint has been manipulated and enlarged to enhance the visibility of the car in the parking lot, it is still difficult to discern whether it is a GEO Group or GEO Transport logo.  Either way, this use of "GEO" cannot possibly rise to the level of defamation or trademark infringement.

there are no other scenes in the ten-episode series featuring an immigration detention facility.  (*See generally* DVD Ex.)

## LEGAL ARGUMENT

"To survive a motion to dismiss, a [pleading] must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although courts must accept a pleading's factual allegations as true, courts do not "accept as true 'unwarranted deductions of fact' or legal conclusions." *Henry v. Jon*es, 484 F. App'x 290, 291 (11th Cir. 2012) (citation omitted).  "A complaint is also subject to dismissal under Rule 12(b)(6) when its allegations on-their-face show that an affirmative defense bars recovery on the claim."  *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1022 (11th Cir. 2001).

As set forth below, Plaintiffs' trademark infringement and unfair competition claims fail as a matter of law because the First Amendment protects Netflix's fictitious television show and Netflix has not mislead audiences into thinking that Plaintiffs created or sponsor the creative work. GEO Transport's defamation claim is facially absurd, since there is no statement susceptible to a defamatory meaning that can possibly be conveyed by the one fleeting, out-of-context image of a tornado-damaged bus with its name.  GEO Group's defamation claim also fails, as there is no statement "of or concerning" GEO Group amid the numerous references to the U.S. government.[7]

---

[7] Netflix also reserves its right to assert additional affirmative defenses to Plaintiffs' respective defamation claims, including but not limited to that neither GEO Plaintiff has been defamed, Plaintiffs' reputations are already materially tarnished by prior reporting of their human rights violations and that Plaintiffs have engaged in sham pleading by labeling a trade libel claim as defamation *per se* in an attempt to avoid the requirement to show actual damages.

# I.    PLAINTIFFS' TRADEMARK-RELATED CLAIMS FAIL AS A MATTER OF LAW.

## A.    Plaintiffs' Federal Trademark Infringement and False Designation of Origin Claims Fail as a Matter of Law Under the *Rogers* Test.

The Eleventh Circuit "construe[s] the Lanham Act narrowly when deciding whether an artistically expressive work infringes a trademark." *University of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012). Plaintiffs' claims that Netflix's display of GEO logos on background props and costumes in the fictional *Messiah* constitute trademark infringement and false designation of origin are a direct affront to the First Amendment protections afforded to artistic works.[8]

The broad First Amendment protection for artistic works faced with Lanham Act claims was addressed in the seminal case of *Rogers v. Grimaldi*, 875 F.2d 994 (2d Cir. 1989). At issue in *Rogers* was a fictional film about a dancing Italian couple, entitled "Ginger and Fred." *Id.* at 996–97. Ginger Rogers, a dancer who famously worked with Fred Astaire, sued under Section 43(a) of the Lanham Act, claiming that the film's title infringed the trademark she held in her own name, which she had previously licensed. *Id.* at 996-97. The Second Circuit held that the First Amendment precluded a Lanham Act claim levied against an expressive work, unless the use of the trademark has no artistic relevance to the underlying work whatsoever or unless the defendant explicitly misleads the consumer as to the source or content of the work. *Id.* at 999.

The Eleventh Circuit explicitly adopted the *Rogers* test in 2012, holding that the First Amendment barred the University of Alabama from asserting trademark claims against an artist who painted famous scenes from Alabama football history that depicted the University's uniforms, helmet design, and crimson and white color scheme. *See Univ. of Alabama*, 683 F.3d at 1276. Emphasizing the importance of protecting creators' First Amendment rights, the Eleventh Circuit

---

[8] The Eleventh Circuit has repeatedly held that claims for trademark infringement and false designation of origin under the Lanham Act are subject to the same form of analysis under the *Rogers* Test. *Univ. of Alabama*, 683 F.3d at 1278 (citing *Tana v. Dantanna's,* 611 F.3d 767, 777 n. 9 (11th Cir. 2010)). Consequently, the following analysis applies to Plaintiffs' Count Two (15 U.S.C. § 1114) and Count Three (15 U.S.C. § 1125(A)(1)(a)).

held that the "risk of misunderstanding, not engendered by any overt [misrepresentation by the defendant] is so outweighed by the interest in artistic expression[,] as to preclude any violation of the Lanham Act." *Id.* at 1279 (quoting *Rogers*, 875 F.2d at 1001) (quotations omitted). Although the facts of *Rogers* concerned only the title of the film in question, the Eleventh Circuit joined other sister circuits and expressly held that the *Rogers* test also applies "in cases where trademark law is being used to attack the content – as opposed to the title – of works protected by the First Amendment." *Id.* at 1277.

As a result, *Messiah*'s "artistically expressive use of a [GEO] trademark will not violate the Lanham Act 'unless the use of the mark has no artistic relevance to the underlying work whatsoever, or, if it has some artistic relevance, unless it explicitly misleads as to the source or the content of the work.'" *Id.* at 1278 (quoting *ESS Entm't 2000, Inc. v. Rock Star Videos, Inc.,* 547 F.3d 1099 (9th Cir. 2008)). Numerous courts in this Circuit have dismissed trademark claims on a 12(b)(6) motion because for failing the *Rogers* test. *See, e.g.*, *Vallejo v. Narcos Prods., LLC*, No. 1:18-CV-23462-KMM, 2019 WL 5884513, at *4 (S.D. Fla. May 24, 2019) (dismissing trademark claim of former mistress of Pablo Escobar on ground that fictionalized depiction of her in television show *Narcos* was permissible under the *Rogers* test); *Valencia v. Universal City Studios LLC*, No. 1:14-CV-00528-RWS, 2014 WL 7240526, at *8 (N.D. Ga. Dec. 18, 2014); *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 181 (S.D.N.Y. 2012).

**B.** **Messiah Is an Expressive Work Protected By the First Amendment**.

A narrative, fictional television show like *Messiah* is a form of expressive speech protected by the First Amendment. *See Vallejo*, 2019 WL 5884513, at *4 (applying *Rogers* test to Netflix television series *Narcos*); *Valencia*, 2014 WL 7240526, at *1 (applying *Rogers* test to the film *Honey*); *Twentieth Century Fox TV v. Empire Distrib., Inc.*, 875 F.3d 1192, 1197 (9th Cir. 2017) (applying *Rogers* to television series *Empire*). The fact that a creative work may be produced for commercial distribution does not lessen the scope of the First Amendment protection afforded to the work. *See Univ. of Alabama*, 683 F.3d at 1276.

1. **The Alleged Use of Plaintiffs' Logos Meets the Purposefully Low Threshold for "Artistically Relevant"**.

The uses of GEO's logos at issue are artistically relevant for the scenes in *Messiah* that take place in a fictional immigrant detention center.  Likewise, the depiction of the damaged GEO Transport bus in a town near the Mexican border visually imparts the toll of the tornado's destruction and the inexplicable sparing of the pastor's church. "The threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has *no* artistic relevance to the underlying work *whatsoever.*'"  *Louis Vuitton*, 868 F. Supp. 2d at 178 (quoting *Rogers*, 875 F.2d at 999). "[I]t is not the role of the Court to determine how meaningful the relationship between a trademark and the content of a literary work must be; consistent with *Rogers*, any connection whatsoever is enough." *Dillinger, LLC v. Elec. Arts Inc.,* No. 09–cv–1236 (JMS)(DKL), 2011 WL 2457678, at \*6 (S.D. Ind. June 16, 2011) (finding the name "Dillinger" in reference to a Tommy Gun had an above-zero relevance to a video game that enabled players to act like mafia members).

*Messiah* uses numerous real-life logos and trade names to frame the fictionalized story, enhance the viewing aesthetics, and accentuate the plot. In episode four alone, the Department of Homeland Security, the Central Intelligence Agency, the Department of Justice's Executive Office of Immigration Review, and the American Civil Liberties Union are all depicted as playing roles in al-Masih's deportation proceeding. (*See generally*, DVD Ex., Disc 5.)  The episode is also replete with references to contemporary news and social media companies (*e.g.*, Fox News, CNN, MSNBC, Facebook) that enhance the viewers' sense that the action is occurring during the present day.  (*See generally*, DVD Ex., Disc 5.)

Courts have repeatedly held that use of real-life trademarks to enhance the sense of realism in a fictional work satisfies the "artistic relevance" prong of the *Rogers* test.  *See, e.g.*, *VIRAG, S.R.L. v. Sony Computer Entm't Am. LLC*, No. 3:15-CV-01729-LB, 2015 WL 5000102, at \*11 (N.D. Cal. Aug. 21, 2015), *aff'd*, 699 F. App'x 667 (9th Cir. 2017) (holding on Rule 12(b)(6) motion that use of VIRAG® mark on video game race car livery had artistic relevance because it

enhanced the realism of the simulated race); *see also Univ. of Alabama*, 683 F.3d at 1278-79 ("The depiction of the [plaintiff's football team's] uniforms in the content of these items is artistically relevant to the expressive underlying works because the uniforms' colors and designs are needed for a realistic portrayal of famous scenes from Alabama football history.").

## 2. Messiah Does Not Explicitly Mislead as to Its Source or Content.

Plaintiffs do not allege, nor can they, that Netflix has explicitly mislead any consumer about the source or content of *Messiah* – much less that Netflix has mislead consumers into believing that GEO Group or GEO Transport are the producers or sponsors of *Messiah*.  "To be 'explicitly misleading,' the defendant's work must make some ***affirmative statement*** of the plaintiff's sponsorship or endorsement, beyond the mere use of plaintiff's name or other characteristic." *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 947 F. Supp. 2d 922, 932 (N.D. Ind. 2013),  *aff'd*, 763 F.3d 696 (7th Cir. 2014) (emphasis added) (quoting *Dillinger*, 2011 WL 2457678). When the "extent of [defendant's] use of the [plaintiff's] trademarks is their mere inclusion . . . in the body of the image," the explicitly misleading prong of the *Rogers* test is not satisfied and the Lanham Act claims must be dismissed. *Univ. of Alabama*, 683 F.3d at 1279.

Plaintiffs also do not, nor can they allege, that Netflix marketed *Messiah* as "endorsed" or "sponsored" by GEO Group, or otherwise made an explicit statement that *Messiah* was affiliated in any way with GEO Group.  *Id.* at 1279; *cf.* Compl. ¶¶ 63-88.  To the contrary, *Messiah* is accessible only on Netflix's streaming platform, shows the Netflix red "N" logo and a title card saying "A Netflix Original Series" at the beginning of each episode, and makes no mention of GEO Group or GEO Transport in the episodes' credits.  Indeed, the actors who don the GEO Group logo on their costume are credited only as "security guards," not as having any connection to Plaintiffs.  (DVD Ex., Disc 5, 01:24:29; 01:24:31); *see Stewart Surfboards, Inc v. Disney Book Grp., LLC*, No. CV 10-2982 GAF (SSX), 2011 WL 12877019, at *7 (C.D. Cal. May 11, 2011) (dismissing trademark claims for failure to meet the "explicitly misleading" prong of the *Rogers*

test and noting that the disputed book's "jacket and spine include the Disney logo, the 'Disney Press' logo, and the Disney channel logo . . .").

Moreover, the context of Netflix's use of the GEO logo or name makes it implausible that a consumer would assume Plaintiffs to be the source of the television series.  No reasonable consumer would assume that Plaintiffs, who are in the business of operating detention facilities and detainee transports, branched out into the production of a fictional thriller television series. *See E.S.S. Entm't 2000, Inc.*, 547 F.3d at 1100-01 ("A reasonable consumer would not think a company that owns one strip club in East Los Angeles, which is not well known to the public at large, also produces a technologically sophisticated video game like [Grand Theft Auto] San Andreas.").

Because the minimal, fleeting use of Plaintiffs' logos is artistically relevant to *Messiah* and *Messiah* does not explicitly mislead consumers as to the source or content of the work, Plaintiffs' federal trademark infringement and false endorsement claims are barred by the First Amendment under the *Rogers* test and fail as a matter of law.

**C.**       **Plaintiffs' State Law Trademark and Unfair Competition Claims Fail**.

Plaintiffs' claims for state law trademark infringement, unfair competition, and violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") are premised on the same facts as Plaintiffs' Lanham Act claims: the use of Plaintiffs' logos in the episodes three and four. (Compl. ¶¶ 90-106.)   It is well established that in the Eleventh Circuit, "[c]ourts may use an analysis of federal [trademark] infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012) (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.,* 261 F.3d 1188, 1193 n4 (11th Cir. 2001)); *see also Natural Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1332–33 (11th Cir. 2008) ("Since Natural Answers is unable to bring an unfair competition claim under the *Lanham Act* under the theory of either false advertising or trademark infringement, it follows that the common law claims based on unfair competition and trademark infringement

must fail as well.") (citation omitted).

This principle remains true when Lanham Act claims are disposed of by the *Rogers* test, instead of other Lanham Act defenses such as lack of a valid trademark or lack of customer confusion.  *See Vallejo*, 2019 WL 5884513, at *5 (dismissing trademark claim against television program *Narcos* based on *Rogers* test and thus "for the same reasons Plaintiff fails to state a claim under the Lanham Act, Plaintiff fails to state [unfair competition] claim under Florida State law."); *Medina v. Dash Films, Inc.*, No. 15-CV-2551 (KBF), 2016 WL 3906714, at *4 (S.D.N.Y. July 14, 2016) ("[T]he same First Amendment considerations that limit a cause of action under the Lanham Act apply also to a cause of action under New York law.") (citation & quotations omitted); *Novalogic, Inc. v. Activision Blizzard*, 41 F. Supp. 3d 885, 904 (C.D. Cal. 2013).

The First Amendment protects Netflix with equal force against Plaintiffs' federal Lanham Act claims and Plaintiffs' overlapping state law trademark, unfair competition, and FDUTPA claims.  Counts Four, Five, and Six of Plaintiffs' Complaint should therefore be dismissed.

## II.    <u>PLAINTIFFS' DEFAMATION CLAIMS FAIL AS A MATTER OF LAW</u>.

Although Plaintiffs engage in group pleading, improperly lumping GEO Group and GEO Transport together with single defined term to allege that "GEO" has been defamed, each Plaintiff's defamation claim must be analyzed separately.  Separating GEO Group's and GEO Transport's claims exposes the frivolity of each.

Under Florida law, a claim for defamation must allege: (1) publication; (2) falsity; (3) that the publisher acted with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; (5) that the statement is defamatory and (6) that the statement is "of and concerning" the plaintiff. *Carroll v. TheStreet.com, Inc.*, No. 11-CV-81173, 2012 WL 13134547, at *3 (S.D. Fla. May 25, 2012) (internal citations omitted); *see also Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1105 (Fla. 2008); *Thomas v. Jacksonville Television, Inc.*, 699 So.2d 800, 804 (Fla. 1st DCA 1997).

When a plaintiff alleges defamation on the basis of a television program, the Court should review the entire episode to place the allegedly defamatory statement in its proper context. *See Spilfogel v. Fox Broad. Co.*, No. 09-CV-80813, 2010 WL 11504189, at *4 (S.D. Fla. May 4, 2010), *aff'd*, 433 F. App'x 724 (11th Cir. 2011) (finding "after viewing the episode in its totality," that inclusion of plaintiff in *COPS* reality television show could not have defamatory effect); *Parekh v. CBS Corp.*, No. 19-11794, 2020 WL 3400679, at *3 (11th Cir. June 19, 2020) (evaluating allegedly defamatory statement in television news program regarding plaintiff "in the context of the publication") (citation & quotations omitted); *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla. 4th DCA 1983) ("Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.") (citation omitted).

### A.    There Is No Statement Susceptible to a Defamatory Interpretation Regarding GEO Transport In the Two Seconds Its Name Appears.

Whether a statement "is susceptible to defamatory interpretation [is a question] of law for the court," and can be determined at the motion to dismiss stage. *Turner v. Wells*, 879 F.3d 1254, 1262–63 (11th Cir. 2018) (citation omitted); *Parekh*, 2020 WL 3400679, at *3 (affirming dismissal on ground that statement was not defamatory); *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15 (11th Cir. 1985) (whether statement is reasonably capable of defamatory interpretation "is to be made by the trial judge in the first instance").

Geo Transport fails to allege how it was defamed.  GEO Transport is never mentioned by name in *Messiah*.  No character makes any statement about GEO Transport.  Instead, GEO Transport's logo is visible once, in passing, ***for at most two seconds*** in episode three as part of a montage of images showcasing the damage inflicted by a fictitious tornado. (DVD Ex., Disc 5, 11:17-11:19.) The two-second shot of a bus bearing the GEO Transport name is preceded by numerous other shots of the devastation, including the buildings and vehicles (including a yellow

school bus), destroyed by the tornado.  (*See generally* DVD Ex., Disc 5.)  The only structure in the entire town not destroyed by the tornado is the church at the center of the story.

Moreover, this scene (and episode) occurs ***before*** the protagonist is detained and before the detention center is even introduced.  Even if some viewers were to see or appreciate the GEO Transport bus and logo during the fleeting moment they appear on screen amidst the total devastation of the town, it would be untethered GEO Transport's transportation products or services.  There is thus no conceivable "statement" about GEO Transport that is susceptible to a defamatory interpretation in episode three, which primarily concerns a pastor and church that appear to be "saved" from their spiritual and actual destruction by al-Masih.

The only "statement" that could possibly be conveyed through this fleeting image is that GEO Transport's buses (like the yellow school bus, other vehicles, and other objects) may not be tornado-proof. Any such statement does not subject GEO Transport to "hatred, distrust, [or] ridicule."[9] (Compl. ¶ 52.)  "Florida law requires as part of a successful libel suit that the statement at issue be reasonably capable of a defamatory interpretation . . . ."  *Keller* 778 F.2d at 714.  When considered in the context of the full episode, as Florida law requires, there is no defamatory statement conveyed about GEO Transport in the sole image of GEO Transport in *Messiah*.  GEO Transport's defamation claim must therefore be dismissed.

**B.**     <u>**There Is No Statement "Of And Concerning" GEO Group**</u>.

Geo Group's allegation that Netflix made defamatory statements about GEO Group's treatment of immigrants in the fictional detention facility "[t]hrough the scenes of the facility bearing GEO's name and trademarks . . ."  (Compl. ¶ 36), is belied by an actual review of episode

---

[9] Should Plaintiffs take the position that the shot of a GEO-marked car in the parking lot of the detention facility is a display of the GEO Transport (as opposed to the GEO Group) logo, there is still no statement susceptible to defamatory interpretation.  The seven-second scene merely conveys how al-Masih is transported from the local sheriff's office to an immigration detention facility via a (different) van that is prominently marked with the Department of Homeland Security logo.  There is nothing defamatory about a car bearing the GEO Transport logo outside of an immigration detention facility; the exact type of facility that GEO Transport regularly services.

four.  The majority of the scenes that take place in the detention facility concern either al-Masih's interrogation by the CIA agent (who is ***not*** wearing a uniform bearing the GEO name or logo) or camera pans of al-Masih sitting quietly alone (where, again, no GEO logo visible).  Of the four shots that include a GEO Group logo buried in the background, two do not even depict how detainees are housed at a detention center.  The other two camera shots include both images of detained immigrants and the (barely perceptible) GEO Group logo, but make no suggestion or statement that the GEO Group, rather than the federal government, is responsible for the conditions in which the immigrants are housed.[10]

The "of and concerning" prong of defamation requires that the allegedly defamatory statement clearly be directed at the plaintiff.  Merely mentioning the plaintiff cannot sustain a *prima facie* cause of action.  *See Thomas v. Jacksonville TV, Inc.*, 699 So.2d 800, 805 (Fla. 1st DCA 1997) (upholding pre-discovery dismissal of complaint with prejudice because plaintiffs failed to allege that defamatory statement was "of and concerning" particular plaintiffs).  In *Jones v. Community Newspapers, Inc.*, for example, a newspaper ran a story about two brothers that were indicted for distribution of cocaine.  No. 3:05CV240 J16MMH, 2006 WL 2507610, at *1 (M.D. Fla. Aug. 29, 2006), *aff'd*, 223 F. App'x 884 (11th Cir. 2007).  The story stated that "the Jones brothers also own Jones Trucking on State Road 17 in Palatka."  The wife of one of the Jones brothers, and the sole owner of Jones Trucking, sued for defamation, alleging that she was defamed by the statement in the news story that implied her business was involved in the cocaine distribution.  *Id.* at *1.  After evaluating the allegedly defamatory sentence in the context of the entire news story, the district court held that the article was not "of and concerning" Jones Trucking. *Id.* at *3.  The district court found it relevant that the "newspaper article in question only referred

---

[10] Similarly, to the extent that GEO Group bases its defamation claim on a sign in the background of one scene that says "Parking for DHS and GEO" and bears the ***Department of Homeland Security's logo***, not GEO's logo, that sign only further reinforces that it is the federal government, not GEO, in control of the detention center.  Moreover, the cropped, zoomed-in image included in the Complaint is misleading (Compl. ¶ 33); the actual shot focuses on characters standing outside the detention center, and the sign is only barely visible in the background.

to Jones Trucking in one sentence" of a twenty-one paragraph article, and that the article focused on the arrest and indictment of the cocaine distributors.  *Id.*  Further, "[t]here was no inference that the business, Jones Trucking, was involved in illegal drug trafficking or acted as a 'front' for such business."  *Id.*

Similarly, in *McIver v. Tallahassee Democrat, Inc.*, both an individual (Mr. McIver) and a corporation (Southeastern Realty) sued for defamation concerning a newspaper story that reported McIver had tried to bribe a city official. 489 So.2d 793, 794 (Fla. 1st DCA 1986).  The sole mention of Southeastern Realty in the article was in a sentence that identified McIver as the president of Southeastern Realty.  *Id.*  The court held that "the entire substance of the publication about the alleged incident was the presumed unlawful action by the individual McIver," and consequently that there was no defamatory statement "of and concerning" Southeastern Realty.  *Id.*

As in these cases, it is readily apparent that GEO Group cannot fulfill the "of and concerning" prong of a *prima facie* defamation claim.  The al-Masih character is initially detained in a facility with the sign "Sheriff's Office" by the Will Mathers character who identifies himself as a member of the Department of Homeland Security "Joint Terrorism Task Force."  (DVD Ex., Disc 5, 25:32-25:44.)  At the beginning of episode four, al-Masih is being transported to a detention facility in a van prominently displaying the Department of Homeland Security logo (not the GEO Group's logo).  The Eva Geller character who interrogates al-Masih at the facility is repeatedly identified as a CIA officer.  Before and during the courtroom scenes, other law enforcement agencies are depicted as responsible for al-Masih's detainment and prosecution, including the San Antonio police department, a Department of Justice attorney, and an Executive Office of Immigration Review Judge.  (*See generally* DVD Ex., Disc 5.)  No character ever mentions the GEO Group by name or references any private contractor as being responsible for the detention facility where al-Masih is held.

The average viewer would not perceive al-Masih or any of the other detained immigrants as being detained by GEO Group, but rather as being detained by the federal government (by the

*expressly named* Central Intelligence Agency, the Department of Homeland Security, and the Department of Justice's Executive Office of Immigration Review). There are no defamatory statements "of and concerning" GEO Group,[11] *see Carroll*, 2012 WL 13134547, at *3 (quoting *Thomas*, 699 So.2d at 804, and Geo Group's defamation claim must therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Netflix respectfully requests that this Court enter an order dismissing Plaintiffs' complaint in its entirety, with prejudice, and provide such other and further relief as the Court deems just and proper.

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Netflix respectfully requests oral argument on its dismissal motion. Oral argument would be of assistance to the Court due to the multiplicity of Plaintiffs' overlapping claims to be decided upon the dismissal motion and assist the Court in specifically identifying the audio-visual components at issue. Netflix anticipates that oral argument will necessitate thirty (30) minutes.

---

[11] In the event that the GEO Group's defamation claim were to survive Netflix's motion to dismiss, discovery will show that there was no malicious intent behind Netflix's decision to use a variety of real-life names and logos to establish a sense of time and place in *Messiah*. Further, although Netflix's motion to dismiss is not premised on truthfulness, discovery will show that the reality of conditions in GEO's facilities – including those described in the Inspector General's Report – is starkly different from the glossy, country club-like images (all conspicuously without people in them) splashed throughout its Complaint.

Dated: August 3, 2020

**PRYOR CASHMAN LLP**
*Attorneys for Netflix, Inc.*
Ilene S. Farkas (admitted *pro hac vice*)
James G. Sammataro
Michael B. Adelman (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 2700
Miami, Florida 33131
Telephone: (786) 582-3011
Facsimile:  (786) 582-3004

*s/ James G. Sammataro*
Florida Bar No. 520292


## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 3, 2020, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro