**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

THE GEO GROUP, INC. and
GEO TRANSPORT, INC.

                                                       CIVIL CASE NO. 9:20-cv-80847-RJS

                Plaintiffs,

    v.

NETFLIX, INC.,

                Defendant.

_____/

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**PRELIMINARY STATEMENT**

Although Netflix seeks to drape itself in the First Amendment and claims that its trademark misappropriation enhances the "realism" of the Netflix Original Series *Messiah*, there is nothing realistic about the show's demonstrably *false* and defamatory accusations that The GEO Group, Inc. operates and GEO Transport, Inc. services an immigrant detention facility that houses people in an overcrowded overheated room with a chain-link cage and deprives them of beds, bedding, sunshine, recreation, and educational opportunities. To fix the defamatory falsehoods in *Messiah*, all Netflix had to do was omit the GEO name and trademarks from episodes featuring an immigrant detention facility plagued by conditions that do not exist at GEO facilities. Instead, Netflix scoffs that the trademarks it willfully misappropriated are "barely perceptible" and sends a warning shot to businesses across America that Netflix feels entitled to exploit their trademarks, destroy their goodwill, and misrepresent them with impunity. That is not the law and Netflix's Motion must be denied for two reasons.

*First*, the defamatory scenes are "of and concerning" GEO Group and GEO Transport because repeatedly throughout those scenes, the name "GEO" is explicitly identified on vehicles, a sign in the parking lot of the facility, and on the uniforms of guards at the facility, such that those who know the Plaintiffs can make out that they are depicted operating and servicing the facility.

*Second*, Netflix is not entitled to First Amendment protection because it used Plaintiffs' trademarks in order to broadcast defamatory *false*hoods about them and to mislead viewers about them. Holding otherwise would give billion-dollar entertainment corporations *carte blanche* to destroy the goodwill that trademark protection is intended to protect. As the United States Supreme Court has recognized, "there is no constitutional value in false statements of fact." *Gertz v. Welch, Inc.*, 418 U.S. 323, 340 (1974).

**FACTUAL BACKGROUND**

On behalf of the federal government, The GEO Group, Inc. manages and operates state-of-the-art immigrant detention facilities, which receive transportation services from its in-house transportation subsidiary, GEO Transport, Inc. Compl. ¶¶ 8-9, 15.[1] GEO facilities do not house people in overcrowded, overheated rooms with chain-link cages, but rather provide beds, bedding, air conditioning, recreational spaces like soccer fields and gymnasiums, and educational spaces like classrooms and libraries. *Id.* ¶ 2.

In seeking to prejudice the Court's view of GEO, Netflix improperly attaches an OIG Report from outside the pleadings in support of its Rule 12(b)(6) Motion and falsely insinuates that the report supports Netflix's defamatory accusations. Mot. at 4. It does not. In reality, the OIG Report demonstrates the falsity of Netflix's accusations. Although OIG conducted unannounced inspections of GEO facilities, reviewed their compliance with health, safety, and welfare requirements, interviewed detainees, and reviewed documentary evidence, the report does ***not*** contain any indication that any GEO facilities were housing people in overcrowded overheated rooms with chain-link cages or depriving them of beds, recreation, or educational opportunities. If such conditions existed at GEO facilities, OIG would have identified them in its report. While OIG identified a single GEO facility that did not offer "outdoor recreation," even that finding demonstrates the falsity of Netflix's claims by documenting that the facility in question offered recreation in a gymnasium with a roof that retracted to let in sunshine and fresh air.

GEO has built a reputation and goodwill on its commitment to respecting the human rights of detained immigrants in its care, and obtained trademarks in the GEO name and logos to

---

[1] The Complaint and this brief refer to The GEO Group, Inc. and GEO Transport, Inc. collectively as "GEO" because the companies are part of a fully-integrated real estate investment trust that is listed on the New York Stock Exchange as "GEO" and because that name appears on both companies' trademarks.

distinguish GEO and to build and develop GEO's brand as a company that provides humane environments.  Compl. ¶¶ 8, 22.

In filming the Netflix Original Series *Messiah*, Netflix willfully misappropriated the GEO name and trademarks and used them on vehicles, a parking lot sign, and guard uniforms that appeared before and throughout defamatory scenes of an immigrant detention facility where people were being housed—day and night—in an overcrowded overheated room with a chain-link cage, without beds, sunshine, recreation, or educational opportunities.  *Id.* ¶¶ 1, 27, 29-36. Although GEO notified Netflix of the truth about the conditions at GEO facilities and asked Netflix to remove the GEO name and trademarks from the show, Netflix refused and continues to make the false and defamatory scenes available to millions of people worldwide.  *Id.* ¶¶ 3, 14, 56.

## LEGAL ARGUMENT

### I.   THE DEFAMATORY SCENES ARE "OF AND CONCERNING" BOTH GEO GROUP AND GEO TRANSPORT.

In seeking dismissal of GEO's defamation claim, Netflix urges the Court to view scenes out of context and argues that the defamatory scenes are not "of and concerning" GEO.  In advancing these arguments, Netflix misapprehends the law of defamation in several ways.

***First***, Netflix invites this Court to view the scene of a GEO Transport bus at the end of episode 3 as an "***out-of-context*** image of a tornado-damaged bus," Mot. at 9[2], and argues that some of the scenes showing the GEO name "do not even depict how immigrants are housed at a detention center," *id.* at 7.  But as Netflix concedes elsewhere in its Motion, the scenes must be viewed ***in context***.  *Id.* at 16.  The scene of the GEO Transport bus at the end of episode 3 must be viewed in context with the scenes (in the very next episode) of the GEO Transport car parked at an immigrant detention facility staffed by guards wearing GEO uniforms where GEO Transport vehicles are

---

[2] Emphasis added unless otherwise noted.

expressly authorized to park and where people are being housed—day and night—in an overcrowded overheated room with a chain-link cage and without beds, sunshine, recreation, or educational opportunities. Viewed in context, those scenes make false accusations against **both** GEO Group **and GEO Transport**. Indeed, Netflix's argument that the facility in *Messiah* is "the exact type of facility that GEO Transport regularly services," *id.* at 17 n.9, proves the point: contrary to Netflix's claim, the facility featured in the episode is **not** "the exact type of facility that GEO Transport regularly services;" rather, GEO Transport services facilities that do **not** house immigrants in overcrowded overheated rooms with chain-link cages, but provide beds, air conditioning, recreational spaces, classrooms, and libraries. *See* Compl. ¶ 2.

Even if the scenes of GEO Transport vehicles and the immigrant detention facility where GEO Transport vehicles are expressly authorized to park were ambiguous such that they could convey "only an innocuous meaning" as to GEO Transport (they are not and they do not), it would be "for the trier of fact to decide whether the [show] was understood in the defamatory sense." *Perry v. Cosgrove*, 464 So. 2d 664, 666 (Fla. 2d DCA 1985) (reversing dismissal of defamation claim based on ambiguous statement that "may have been intended to convey and perhaps did convey only an innocuous meaning"). At this stage, it is only for the Court to determine whether the episodes are "***reasonably susceptible*** of a defamatory meaning." *See Kieffer v. Atheists of Fla., Inc.*, 269 So. 3d 656, 660-61 (Fla. 2d DCA 2019); *Pep Boys v. New World Commc'ns of Tampa, Inc.*, 711 So. 2d 1325, 1328 (Fla. 2d DCA 1998).

**Second**, Netflix points out that "the GEO name is, in fact, never **uttered** once in the episodes." Mot. at 2. But there is no requirement whatsoever that a defamation plaintiff's name be "uttered" to satisfy the "of and concerning" requirement. Courts routinely find that the requirement is satisfied when the depiction of the plaintiff is purely visual, even when—unlike

here—the plaintiff's name is not repeatedly and explicitly identified visually. *See, e.g., Boyles v. Mid–Fla. Television Corp.,* 431 So. 2d 627, 641 (Fla. 5th DCA 1983) (reversing dismissal of libel *per se* claim based on two broadcasts that included a photograph of plaintiff but did not identify him by name (and one broadcast that did identify the plaintiff by name)), *approved,* 467 So.2d 282 (Fla. 1985); *Brown v. Tallahassee Democrat, Inc.,* 440 So. 2d 588, 590 (Fla. 1st DCA 1983) (reversing dismissal of defamation claim based on publication of plaintiff's photograph but not his name); *La Luna Enters., Inc. v. CBS Corp.*, 74 F. Supp. 2d 384, 389-391 (S.D.N.Y. 1999) (applying Florida law and finding that a CBS report was "of and concerning" restaurant even though CBS did not name the restaurant but showed footage of it); *see also Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1310-11 (M.D. Fla. 2010) (defamation through use of plaintiff's image but not name); *Di Giorgio Fruit Corp. v. AFL-CIO*, 215 Cal. App. 560, 569-70 (Cal. Ct. App. 1963) (upholding jury verdict that movie defamed plaintiff corporation even though plaintiff corporation was not named in the movie).

All that is required to satisfy the "of and concerning" requirement is that those who know the plaintiffs can make out that they are the ones meant in the defamatory publication. *O'Neal v. Tribune Co.*, 176 So. 2d 535, 548 (Fla. 2d DCA 1965). That standard is easily satisfied here, where the name "**GEO**" appears repeatedly before and throughout the defamatory scenes of the immigrant detention facility staffed by guards wearing uniforms that say "**GEO**"—first on the side of a bus at the end of episode 3 and then in episode 4 on the side of a car parked in the parking lot of the facility, which has a sign expressly authorizing "**GEO**" vehicles to park there. People who know the Plaintiffs know that GEO Group operates immigrant detention facilities and that its in-house transportation subsidiary GEO Transport provides transportation services to those facilities. Compl. ¶¶ 8-9. As such, the "of and concerning" requirement is satisfied because those who know

5

GEO Group and GEO Transport can make out that they are the ones depicted operating and servicing the facility in the show.

The cases Netflix cites do not suggest otherwise. For example, Netflix claims that a statement explicitly identifying "Jones Trucking" by name was held to not be "of and concerning" Jones Trucking. *See* Mot. at 18. Netflix is mistaken. Jones Trucking was not the plaintiff in that case and there was no determination that the statement explicitly identifying "Jones Trucking" was not "of and concerning" Jones Trucking. Rather, the court held that the statement was not "of and concerning" Joyce Jones, an individual who ***was not named*** anywhere in the defamatory publication at issue. *See Jones v. Cmty. Newspapers, Inc.*, No. 05-cv-240, 2006 WL 2507610, at *4 (M.D. Fla. Aug. 29, 2006). Netflix's citation to *McIver v. Tallahassee Democrat, Inc.* is equally puzzling. 489 So. 2d 793, 794 (Fla. 1st DCA1986). That case simply held that a company could not bring a defamation action based on a bribery accusation against its president, but reaffirmed the settled proposition that a company "may recover for libel just as an individual, where," as here, the "publication prejudices it in the conduct of its trade or business." *Id*.

***Third***, Netflix argues that the defamatory scenes "make no suggestion or statement that the GEO Group, rather than the federal government, is responsible for the conditions in which the immigrants are housed," noting that the show also depicts certain government employees, including a DOJ attorney, an immigration judge, and a DHS employee and CIA agent who interrogate their target at the GEO facility. Mot. at 18. But this argument ignores the context of show itself, which makes clear that the DHS employee and CIA agent do ***not*** work at the facility, but go to the facility to question their target after learning that he is being held there. Notably, when being transferred for interrogation, their target is escorted by two guards wearing GEO uniforms—plainly conveying to any reasonable viewer that a GEO facility is being portrayed.

6

Moreover, no reasonable viewer would think that an immigration judge or DOJ attorney are responsible for servicing and operating immigration detention facilities or deciding whether to equip their housing areas with chain-link cages or beds. But, even if reasonable viewers who are not familiar with GEO Group and GEO Transport could possibly make that mistake (they could not), that is not the question: the question is whether viewers who **know** GEO Group and GEO Transport—an operator and a servicer of immigrant detention facilities—can make out that they are the ones portrayed operating and servicing the immigrant detention facility in the show. *O'Neal*, 176 So. 2d at 548. Moreover, even if the show were ambiguous as to whether GEO Group, GEO Transport, and/or the federal government was operating and servicing the immigrant detention facility, Netflix's Motion must be denied because it is "for the trier of fact to decide whether the [show] was understood in the defamatory sense." *Perry*, 464 So. 2d at 666 (reversing dismissal of defamation claim based on ambiguous statement).

In sum, Netflix falsely accused GEO Group and GEO Transport of operating and servicing facilities that detain immigrants in overcrowded overheated rooms with chain-link cages and deprive them of beds, bedding, sunshine, recreation, and educational opportunities. Those accusations are plainly defamatory *per se* as to **both** companies because, considered alone without innuendo, they "tend[] to harm the reputation of [Plaintiffs] by lowering [them] in the estimation of the community" or "expos[e them] to hatred, ridicule, or contempt or injure[] [their] business or reputation . . . ." *Jews For Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108–09 (Fla. 2008); *Perry*, 464 So.2d at 666 ("[A] publication is libelous *per se* if, when considered alone without innuendo, it tends to subject a person to hatred, distrust, ridicule, contempt, or disgrace, or tends to injure him in his trade or profession[.]"); *see also Diamond Ranch Acad., Inc. v. Filer*, No. 14-cv-751, 2016 WL 633351, at *19 (D. Utah Feb. 17, 2016) (accusation that operator of residential youth

7

treatment facility had engaged in abusive treatment was defamatory *per se*); *Mzamane v. Winfrey*, 693 F. Supp. 2d 442, 480-89 (E.D. Pa. 2010) (implication that school headmaster failed to report abuse and neglect was defamatory *per se*).

II. **THE FIRST AMENDMENT DOES NOT ENTITLE ENTERTAINMENT CORPORATIONS TO MISAPPROPRIATE BUSINESSES' TRADEMARKS IN ORDER TO DEFAME THEM AND MISLEAD CONSUMERS.**

Our legal system protects trademarks because "a party has a valuable interest in the good will of his trade or business, and in the trademarks adopted to maintain and extend it." *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 412 (1916). As Justice Holmes observed nearly a century ago, a trademark "deals with a delicate matter that may be of great value but that is easily destroyed, and therefore should be protected with corresponding care." *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 692 (1923). In seeking dismissal of Plaintiffs' trademark claims, Netflix asks this Court to accept a radical and unprecedented proposition that billion-dollar entertainment corporations are entitled to misappropriate others' trademarks in order to defame them to a global audience and ***destroy*** the very goodwill that trademark protection is intended to protect. That argument is meritless and must be rejected.

A. **Netflix's Misappropriation of GEO's Trademarks is Not Artistically Relevant to *Messiah*.**

Invoking the *Rogers* test to seek dismissal of Plaintiffs' state and federal trademark claims, Netflix argues that it its willful misappropriation of Plaintiffs' trademarks is artistically relevant because it enhances the "realism" of *Messiah*. Mot. at 12. This argument fails because there is nothing "realistic" about defamatory ***false***hoods. That is the problem with Netflix's conduct, and that is what distinguishes this case from every single one of the cases Netflix cites. *See, e.g.*, *Vallejo v. Narcos Prods., LLC*, No. 18-cv-23462, 2019 WL 5884513, at *4 (S.D. Fla. May 24, 2019) (no allegation by Pablo Escobar's mistress that the depiction of her in the television show

8

*Narcos* was false or defamatory); *Valencia v. Universal City Studios LLC*, No. 14-cv-528, 2014 WL 7240526, at *8 (N.D. Ga. 2014) (no allegation that the movie *Honey*—about a fictional Bronx-based Latina hip hop dancer named Honey Daniels—had defamed a Bronx-based Latina hip hop dancer who used the stage name Honey Rockwell); *VIRAG, S.R.L. v. Sony Comput. Ent. Am. LLC*, No. 15-cv-1729, 2015 WL 5000102, at *11 (N.D. Cal. Aug. 21, 2015), *aff'd*, 699 F. App'x 667 (9th Cir. 2017) (no allegation that use of company's trademark on video game race car livery defamed the company); *Louis Vuitton Malletier S.A. v. Warner Bros. Ent. Inc.*, 868 F. Supp. 2d 172, 181 (S.D.N.Y. 2012) (no allegation that *The Hangover*'s depiction of fake Louis Vuitton bag or character's comedic reference to his "Lewis Vuitton" bag had defamed Louis Vuitton); *Twentieth Century Fox Television v. Empire Distribution, Inc.*, 875 F.3d 1192, 1192 (9th Cir. 2017) (no allegation that the show *Empire* defamed the real-life Empire record label).

While the Eleventh Circuit has applied the *Rogers* test to a case where the trademarked content was "**needed** for a **realistic** portrayal" of historic events, *Univ. of Ala. Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1278–79 (11th Cir. 2012), it has never authorized entertainment corporations to destroy businesses' goodwill by misappropriating their trademarks to present **unrealistic**, false, and defamatory depictions of them.  Indeed, Netflix does not cite a single case from any jurisdiction in which a court applied the *Rogers* test and dismissed a company's trademark claims where the complaint stated a claim for defamation that was based on the use of the company's trademarks.  No such cases appear to exist.

Where, as here, a trademark is used to paint an ***inaccurate*** and offensive picture of the trademark's associations, it is not artistically relevant and is not entitled to First Amendment protection under the *Rogers* test.  *See Parks v. LaFace Recs.*, 329 F.3d 437, 454 (6th Cir. 2003) (applying the *Rogers* test and reversing grant of summary judgment to musical group OutKast that

9

had titled a song "Rosa Parks" because "[i]n lyrics that are laced with profanity and in a 'hook' or chorus that is pure egomania, many reasonable people could find that this is a song that is clearly *antithetical* to the qualities identified with Rosa Parks.") (emphasis in original). Netflix's uses of Plaintiffs' trademarks have no artistic relevance and are not protected by the First Amendment because they undermine the realism of *Messiah* by falsely portraying Plaintiffs. "[T]here is no constitutional value in [Netflix's] *false* statements of fact." *Gertz*, 418 U.S. at 340.

Moreover, in applying the *Rogers* test, "the appropriate question to ask is: Did [Netflix] have a **genuine** artistic motive for using [GEO's] mark[s] . . . ?" *Stouffer v. Nat'l Geographic Partners, LLC,* 400 F. Supp. 3d 1161, 1179 (D. Colo. 2019) (emphasis added). Although Netflix offers self-serving say-so that it misappropriated GEO's trademarks because they have "artistic relevance" to *Messiah*, its own admissions rebut this assertion. As Netflix concedes, "[i]mmigration policy and treatment of immigrants is hardly a focus of the plot." Mot. at 5. This admission—coupled with Netflix's assertions that the trademarks it willfully misappropriated are "imperceptible," "fleeting," "flickering glimpses," "barely legible," and of the "blink-and-you'll-miss-them" nature—rebut Netflix's assertion that it misappropriated those trademarks because they had artistic relevance to the show. Mot. at 1, 3, 12. Only discovery will reveal Netflix's true intentions. At this stage, the Complaint alleges that "[b]ecause Netflix researched GEO during the process of producing *Messiah*, it was aware that the use of the GEO Trademarks did not further a goal of realism or serve any purpose other than to harm GEO's good will and reputation." Compl. ¶ 46. The Court's task "is **not** to accept without question whatever purpose [Netflix] may now claim they had in" misappropriating GEO's trademarks; rather, whether the trademarks have any artistic relevance "must be resolved by a finder of fact following an evidentiary hearing and not by a judge as a matter of law upon [a] limited record submitted in support of a motion for summary

10

judgment." *Parks*, 329 F.3d at 454, 459. All the more so at the motion to dismiss phase, where there has been no opportunity for discovery into Netflix's true motives and the well-pled allegations in the Complaint must be accepted as true and construed in the light most favorable to Plaintiffs. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999).

### B. Netflix Explicitly Misled Consumers

Even if Netflix's ***false*** representation of GEO through the willful misappropriation of GEO's trademarks enhanced the goal of "realism" in *Messiah* (it does not), Netflix's *Rogers* defense would still fail because the Complaint alleges that Netflix explicitly misled consumers as to GEO's approval or authorization of the use of its trademarks. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir. 1989). Contrary to Netflix's assertion that "Plaintiffs do not allege . . . that Netflix has explicitly misle[]d any consumer about the source or content of *Messiah*." Mot. at 13-14. GEO has alleged exactly that:

> 49. Netflix's misuse of the GEO Trademarks in connection with the facility featured in *Messiah* **has confused and deceived the public into believing that the featured facility is a real GEO Facility or is associated with or sanctioned by GEO**—all to the damage and detriment of GEO's reputation, goodwill, and profits.
>
> …
>
> 69. Netflix's use of the GEO Trademarks on goods and services that are confusingly similar to those offered by GEO is ***likely to cause confusion among consumers and potential consumers*** as to the source, sponsorship, affiliation, or approval of goods and services sold by Netflix in connection with their infringing trademarks.
>
> …
>
> 81. Defendant's use of the GEO Trademarks constitutes a ***false designation of origin, a false or misleading description of a fact, or a false or misleading representation of fact*** that is likely to cause confusion, mistake, or deception in violation of Lanham Act § 43(a), 15 U.S.C. § 1125(A)(1)(a).
>
> 82. Netflix has adopted and is using the GEO Trademarks in a manner that is likely to cause confusion, and is causing confusion, mistake, and deception among the general public ***as to the origin and affiliation of Netflix with GEO***.

11

> 83. ***Netflix is likely to deceive the public into believing that the references to the GEO Trademarks in episodes 3 and 4 of the series Messiah originate from, are associated with, or are otherwise authorized by GEO***, all to the damage and detriment of GEO's reputation, goodwill, and profits.

Compl. ¶¶ 49, 69, 81–83. Although Netflix asserts otherwise, the use of a trademark can be explicitly misleading without an affirmative statement of plaintiff's sponsorship or endorsement. *See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th Cir. 2018). The *Gordon* court reasoned an affirmative statement is ***not*** necessary when "the use of a mark alone may explicitly mislead consumers about a product's source if consumers would ordinarily identify the source by the mark itself." *Id*. Although Netflix invokes the disclaimer in the credits of the show, the disclaimer is irrelevant because, although it says that "characters and events" are fictitious, it says nothing about the companies and facilities depicted, and it does nothing to negate the false impression that GEO authorized the repeated use of its trademarks.

Further, relevant considerations include "the degree to which [Netflix] use[d] the mark in the same way as [Plaintiffs]" and "the extent to which [Netflix] has added [its] own expressive content to the work beyond the mark itself." *Id.* at 270–271. In this case, Netflix used GEO's trademarks just as GEO uses them—the same image, the same design, placed on the sides of vehicles where GEO Transport places them and at an immigration detention facility on guard uniforms precisely how and where GEO Group places them. Compl. ¶ 29. Given that Netflix used GEO's trademarks in the same way that GEO uses them, and did so repeatedly in two different episodes, it is entirely plausible to infer that members of the public believed that Netflix's use of GEO's trademarks was authorized by GEO. Netflix's *Rogers* defense to Plaintiffs' state and federal trademark claims therefore fails. *See MGFB Props., Inc. v. Viacom, Inc.*, No. 19-cv-257, 2019 WL 8096508, at *1 (N.D. Fla. Oct. 21, 2019) (denying motion to dismiss based on *Rogers* defense where complaint alleged, among other things, that defendants' use of plaintiff's name was

12

likely to cause confusion about the source of the show); *see also Bryant*, 187 F.3d at 1273 n.1 (at the motion to dismiss stage, "all-well pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff.")

## CONCLUSION

Businesses have the right not to have their own trademarks willfully misappropriated and weaponized to misrepresent them and destroy the goodwill their trademarks were intended to protect. Netflix's Motion to Dismiss should be denied.

Dated: September 18, 2020

Respectfully Submitted,

*/s/ Shannon B. Timmann*
Shannon B. Timmann, Esq. (Fl. Bar. No. 98810)
Megan L. Meier, Esq. (*Pro Hac Vice*), Va. Bar No. 887220
**CLARE LOCKE LLP**
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
Email: megan@clarelocke.com
Email: shannon@clarelocke.com

Barry F. Irwin, P.C. (*Pro Hac Vice*), Ill. Bar No. 6211213
Manon L. Burns (*Pro Hac Vice*), Ill. Bar No. 6329495
**Irwin IP LLC**
222 South Riverside Plaza, Suite 2350
Chicago, IL 60606
Phone: 312.667.6080
Email: birwin@irwinip.com
Email: mburns@irwinip.com

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing document was served by CM/ECF, on September 18, 2020, on all counsel of record.

                                                 */s/ Shannon B. Timmann*
                                                 Shannon B. Timmann