**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 9:20-cv-80847-RJS**

THE GEO GROUP, INC. and
GEO TRANSPORT, INC.

               Plaintiffs,

v.

NETFLIX, INC.,

               Defendant.

_____/


**DEFENDANT NETFLIX, INC.'S REPLY IN FURTHER**
**SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

Defendant Netflix, Inc. ("Netflix") respectfully submits this reply in further support of its motion to dismiss the Complaint (the "Motion").  (D.E. 27).

## PRELIMINARY STATEMENT

This lawsuit is about twenty-eight (28) seconds of video footage.  A review of that footage and the pertinent episodes of Netflix's fictional series, *Messiah*, is all this Court needs to dispense with Plaintiffs' claims.  Plaintiffs, however, seek to make this case about everything *other* than the actual video footage: they advocate for *new* law (such as a nonexistent third prong to *Rogers* test, which is controlling precedent); attempt to distract with concocted conspiracy theories (a supposed intent to "destroy" their business through the imperceptible display of their logo); and speculate as to Netflix's supposed "motivations" (which are not only unfounded, but legally irrelevant).  Plaintiffs' Opposition attempts to divorce Plaintiffs' claim from not just *Messiah*'s actual episodes but, incredibly, from the manipulated, enlarged, cropped and isolated screen shots used in their Complaint.  The divide between the actual footage, Plaintiffs' characterization of these episodes and controlling precedent cannot be any wider.

Once the Court views *Messiah*, it becomes apparent that the fictional series' use of the Plaintiffs' marks easily satisfies the "purposefully low" artistic relevance prong of the *Rogers* test.  This review confirms that the use is not "explicitly misleading," as Netflix has not made any affirmative statement to mislead "consumers" into believing that Plaintiffs, operators of detention centers and a related transportation service, have sponsored *Messiah* or tried their hand at producing a fictional television series.  The fleeting use of Plaintiffs' marks in the context of *Messiah* is protected by the First Amendment, mandating dismissal of Plaintiffs' trademark infringement-related claims.

A review of *Messiah* also makes clear that *Messiah* does not defame either of the Plaintiffs.  There is, for example, no statement susceptible to a defamatory interpretation concerning GEO Transport in the single, two-second scene in which a bus bearing its name appears among wreckage caused by a fictional tornado.  And no reasonable viewer would perceive that the

fleeting moments in which GEO Group's logos appears (together with other third-party logos), in the background of scenes, reasonably convey any false statement of fact about GEO Group.

## I.      PLAINTIFFS' TRADEMARK CLAIMS SHOULD BE DISMISSED

### A.      Plaintiffs Ignore Controlling Precedent, and Seek to Rewrite the Well-Established *Rogers* Test by Adding a Third Element.

Where, as here, a plaintiff asserts claims based on the use of a trademark in an expressive work such as *Messiah,* the Eleventh Circuit has adopted the so-called *Rogers* test, based on the Second Circuit's seminal decision in *Rogers v. Grimaldi.*  875 F.2d 994, 999 (2d Cir. 1989)*; see also University of Alabama Bd. of Trustees v. New Life Art, Inc.*, 683 F.3d 1266 (11th Cir. 2012).

Plaintiffs concede, as they must, that the *Rogers* test governs their Lanham Act claims, but argue, without ***any*** legal support, that there should be a "defamation exception" to *Rogers*. Specifically, Plaintiffs advocate that the creator of the expressive work should be stripped of its First Amendment rights if the trademark owner disapproves of the manner in which its trademark is depicted.  (D.E. 38 at 8-9). If this were the law (and it is decidedly not), a plaintiff need only express displeasure or utter the word, "defamatory" and their trademark claims would survive the *Rogers* test and undermine the important First Amendment values that *Rogers* protects.  *Univ. of Alabama*, 683 F.3d at 1277 ([T]he Lanham Act should be read narrowly to avoid impinging on speech protected by the First Amendment.") (citation omitted).  By limiting the exception to only those uses that the trademark owner agreed were in a flattering or "realistic" light, Plaintiffs' proposed test would not only swallow the rule, but undercut the very purpose of the First Amendment: to allot for artistic expression, flattering or otherwise.

There is no support for Plaintiff's argument, and similar arguments have been repeatedly rejected, including, for example, in:

- *Louis Vuitton Malletier S.A. v. Warner Bros. Entm't Inc.*, 868 F. Supp. 2d 172, 175–76 (S.D.N.Y. 2012) (relying on *Rogers* in dismissing plaintiff's claim that the alleged use of knockoff bag in the defendant's film "tarnish[es] the LVM Marks,"));

- *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894, 902-03 (9th Cir. 2002) (dismissing plaintiff's claim that the song *Barbie Girl* "tarnishes the [Barbie] mark because the

song is inappropriate for young girls," applying *Rogers*);

- *Roxbury Entm't v. Penthouse Media Grp., Inc.*, 669 F. Supp. 2d 1170, 1176 (C.D. Cal. 2009) (relying on *Rogers* in dismissing plaintiff's objection to use of its trademark in pornographic film).

Indeed, in *Rogers*, Ginger Rogers brought both trademark *and* defamation claims, and both were dismissed. *Rogers*, 875 F.2d at 1005. There is no "defamation exception" to the *Rogers* test. The Court should follow the Eleventh Circuit's clear precedent, and reject Plaintiffs' attempt to make new law.

**B.     Netflix Satisfies the First Prong of the *Rogers* Test, as the Uses of the GEO Group and GEO Transport Trademarks Easily Clear the "Purposefully Low" Bar of Artistic Relevance.**

"The threshold for 'artistic relevance' is purposely low and will be satisfied unless the use 'has *no* artistic relevance to the underlying work *whatsoever.*'" *Louis Vuitton Malletier, S.A.*, 868 at 178 (quoting *Rogers*, 875 F.2d at 999) (emphasis in original). A defendant need only demonstrate that the mark's relevance to the artistic work is "***above zero***." Despite this exceedingly low threshold, Plaintiffs argue that use of a trademark cannot satisfy the "above zero" threshold if the expressive work paints an "inaccurate and offensive picture of the trademark's associations." (D.E. 38 at 9). Once again, this is not the law, and Courts have repeatedly rejected substantively similar arguments.

In *Dillinger, LLC v. Electronic Arts Inc.*, for example, the plaintiff held the trademark rights in John Dillinger, the "legendary gentleman-bandit," famously associated with submachine guns known as "Tommy Guns." *See* No. 1:09-CV-1236-JMS-DKL, 2011 WL 2457678, at *2 (S.D. Ind. June 16, 2011). Electronic Arts published multiple videogames adapted from Mario Puzo's famous *Godfather* novels in which players could use "Dillinger Tommy Guns" to conduct an array of criminal activities. *Id.* at 3. The plaintiff complained that the use of its mark was inaccurate and thus could not satisfy the artistic relevance prong of the *Rogers* test, as Dillinger does not appear in the *Godfather* novels or movies, and was not even alive during the time period the *Godfather* is

set.  The court disagreed, finding that "the 'mental imagery' associated with the Dillinger name *has more than zero relevance*," to a videogame that "enables players to act like members of the mafia and spray Tommy Guns." *Id.* at 5-6 (emphasis added).  Likewise, in *Roxbury Entertainment*, the plaintiff argued that the use of its "Route 66" mark was offensive and not relevant to a film comprised "primarily [of] graphic sex scenes," some of which occurred at a roadside motel. *See* 669 F. Supp. 2d at 1173.  The district court nonetheless held the artistic relevance prong to be satisfied, because there was "at least some relationship between the mental imagery associated with the term 'Route 66,' *e.g.,* road trips, cross-country travel, and the content of," the pornographic movie.  *Id.* at 1176; *Mil-Spec Monkey, Inc. v. Activision Blizzard, Inc.*, 74 F. Supp. 3d 1134, 1142–43 (N.D. Cal. 2014) ("[Plaintiff] invokes no authority, nor is there any, for the proposition that use of a mark must sufficiently mimic reality to fall within the First Amendment's safe haven.").

The use of the GEO Group and GEO Transport logos in *Messiah* is artistically relevant to enhancing the "look and feel" of scenes set at a fictional immigration detention center in the present day, serving the same purpose as costumes featuring the contemporary logos of the CIA or the Department of Homeland Security, which appear in some of the same scenes.  *See E.S.S. Entm't 2000, Inc. v. Rock Star Videos, Inc.*, 547 F.3d 1095, 1100 (9th Cir. 2008) (cartoonish recreation of plaintiff's "Pig Pen" strip club was relevant to videogame developer's artistic goal of recreating "look and feel" of Los Angeles neighborhood).  Whether or not the fictional facility depicted in *Messiah* is an exact or flattering replica of the facilities GEO Group operates is beside the point; all that the artistic relevance prong requires is that there be some relationship, however tenuous, "between the mental imagery associated with" GEO Group's and GEO Transport's logos and immigration detention facilities. *Roxbury*, 669 F. Supp. 2d at 1176.  That prong of the *Rogers* test is easily met here.

Finally, contrary to Plaintiffs suggestion, there is no need for the Court to probe whether Netflix's "motive" in including Plaintiffs' trademarks in Messiah was to enhance the work's

"artistic relevance."  The use is either "artistically relevant" or it is not.  Motive is irrelevant. *See Dillinger*, 2011 WL 2457678, at *6 ("[I]t is not the role of the Court to determine how meaningful the relationship between a trademark and the content of a literary work must be; consistent with *Rogers*, any connection whatsoever is enough..."); *VIRAG, S.R.L. v. Sony Computer Entm't Am. LLC*, No. 3:15-CV-01729-LB, 2015 WL 5000102, at *12 (N.D. Cal. Aug. 21, 2015), *aff'd,* 699 F. App'x 667 (9th Cir. 2017) ("Under the first prong of the *Rogers* test, the court does not need to determine *exactly* how artistically relevant the VIRAG® mark is to the games; it merely has to be able to conclude that the artistic relevance is 'above zero'") (citation omitted).

C.     **Netflix Satisfies the Second Prong of the *Rogers* Test, as It Did Not Mislead the Consumer as to the Source or Content of *Messiah*.**

The "explicitly misleading" prong of the *Rogers* test focuses on whether the defendant took any action, ***separate and apart*** from using the trademark in the expressive work, to mislead consumers as to who was responsible for creating the work, *E.S.S. Entm't 2000*, 547 F.3d at 1100, *not* as Plaintiffs claim, whether the trademark is visible in the expressive work.  (D.E. 38 at 12). Indeed, to be explicitly misleading, the defendant's work must make an ***affirmative statement*** as to the plaintiff's sponsorship or endorsement.  *See Univ. of Alabama*, 683 F.3d at 1279 (holding painter did not explicitly mislead because "there is no evidence that Moore ever marketed an unlicensed item as 'endorsed' or 'sponsored' by the University."); *Vallejo v. Narcos Prods., LLC*, No. 1:18-CV-23462-KMM, 2019 WL 5884513, at *4 (S.D. Fla. May 24, 2019) (holding Netflix did not explicitly mislead as to the source of its television show *Narcos* because "there are no allegations that Defendants attributed or otherwise suggested that Plaintiff was a producer of the show *Narcos*.").

Plaintiffs do not, and cannot, allege that Netflix made any affirmative statements or took any action to "explicitly mislead" viewers into believing that GEO Group or GEO Transport sponsored or participated in *Messiah*.  Netflix indisputably did not market *Messiah* as "endorsed" or "sponsored" by Plaintiffs, nor did it make any statement that *Messiah* was affiliated with

Plaintiffs in any way.  Rather, *Messiah* opens with the Netflix red "N" logo and a title card saying "A Netflix Original Series" at the beginning of each episode.

The fleeting and partial images of Plaintiffs' trademarks for a combined total of ***twenty-eight seconds***, in two of the series' ten episodes is insufficient, as a matter of law, to "explicitly mislead" consumers into thinking that Plaintiffs, who are in the business of operating detention facilities and detainee transports, branched out into the production of a fictional thriller television series.  *See Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 270 (9th Cir. 2018)  ("No one would think that a song . . . titled 'Barbie' was created by Mattel . . . [n]or would anyone think a company that owns one strip club in East Los Angeles also produces a technologically sophisticated video game.") (internal citations and quotations omitted).  Netflix easily meets the *Rodgers* test.

**D.     Plaintiffs Concede That Their State Law Claims Rise and Fall with the _Rogers_ Test**.

Plaintiffs concede that the dismissal of their Lanham Act claims result in the dismissal of their Florida state law claims for trademark infringement, unfair competition, and violation of the Florida Deceptive and Unfair Trade Practices Act.  *See Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012).  As Plaintiffs' trademark claims fail as a matter of law, their state law claims should also be dismissed.  *See Vallejo*, 2019 WL 5884513, at *5.

**II.     PLAINTIFFS' DEFAMATION CLAIMS SHOULD BE DISMISSED**

**A.     GEO Transport's and GEO Group's Claims Must Be Evaluated Separately**.

Rule 8 requires each plaintiff to separately and independently articulate the facts and circumstances giving rise to its individual causes of action.  The fact that two plaintiffs may have a corporate affiliation does not obviate the need for each to articulate an independent cause of action.  *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 384 (S.D.N.Y. 2016) ("Nor is it sufficient for plaintiffs to simply state in conclusory terms that separate legal entities are 'sometimes collectively referred to' by a shared generic name."); *see also Lane v. Capital Acquisitions & Mgmt. Co.*, No. 04-60602 CIV, 2006 WL 4590705, at *5 (S.D. Fla. Apr. 14, 2006), *aff'd sub nom. Lane v. XYZ Venture Partners, L.L.C.*, 322 F. App'x 675 (11th Cir. 2009) ("[T]he Complaint fails to

differentiate among the defendants . . . By lumping all the defendants together . . . the [] Complaint fails to satisfy the minimum standard of Rule 8.").

GEO Transport and GEO Group are distinct corporate entities with distinct businesses. Any defamation claim must therefore relate to that specific company, and not to the business of the other entity.  And while neither GEO entity states a claim for defamation, separating GEO Transport's defamation claim from GEO Group's claim further highlights its frivolity.

**B.**    **GEO Transport's Defamation Claim is Frivolous**.

To state a claim for defamation, GEO Transport must allege that *Messiah* makes a false statement of fact about GEO Transport that is susceptible to a defamatory interpretation.  But there is no statement about GEO Transport whatsoever – much less a false statement of fact – in *Messiah*. GEO Transport appears once in *Messiah* for a ***total of two seconds*** in episode three, in a scene depicting the devastating aftermath of a fictional tornado where the only structure left standing is a church at the center of the story.  To highlight the church's lone survival, the camera pans over the widespread destruction, which includes all types of destroyed vehicles, including a bus that bears GEO Transport's logo.  The only "statement" conceivably conveyed by this two-second shot is that GEO Transport's busses, like every single other vehicle in this town, are not tornado-proof.

GEO Transport knows full well that this glimpse of their bus (if one even catches it) is not a defamatory statement, and so it manufactures an after-the-fact theory: if you stitch together the tornado-damaged bus with a scene in a *later* episode which *then* introduces the detention facilities, and there is a parking lot in that *later* episode where GEO Transport vehicles "are authorized to park,"[1] those images somehow combine to form a defamatory statement that subjects it to "hatred, distrust, [or] ridicule."  (Compl. ¶ 52).  What the exact statement is remains a mystery.  Any statement that GEO Transport's buses are used to transport detained migrants is neither false nor

---

[1] Plaintiffs argue GEO Transport is depicted when the protagonist is brought to the detention facility (notwithstanding that the al-Masih character is transported to that facility in a van prominently marked with the Department of Homeland Security logo, not GEO Transport's logo).

reasonably susceptible to a defamatory meaning.

A review of the pertinent scene within the context of *Messiah* dispels any contention that a defamatory statement has been made about GEO Transport.[2]  *See Spilfogel v. Fox Broad. Co.*, No. 09-CV-80813-RYSKAMP/VITUNAC, 2010 WL 11504189, at *4 (S.D. Fla. May 4, 2010), *aff'd,* 433 F. App'x 724 (11th Cir. 2011) ("After viewing the episode, there is no indication that Ms. Spilfogel is being treated as, or could be viewed as, a criminal."); *Folta v. New York Times Co.*, No. 1:17CV246-MW/GRJ, 2019 WL 1486776, at *10 (N.D. Fla. Feb. 27, 2019) ("[P]ublications should be evaluated not by extremes, but as the common mind would naturally understand [them]") (internal citations and quotations omitted).  GEO Transport's attempt to pad the anemic claims of GEO Group by jumping on the defamation bandwagon (which too would not survive a tornado) expose the frivolousness of its claims.  GEO Transport's claims should be dismissed.

### C.      Episode Four of Messiah Is Not "Of And Concerning" GEO Group

To satisfy the "of and concerning" prong of a defamation claim, a plaintiff must demonstrate that the alleged defamatory statement is about ***the plaintiff***.   That the plaintiff is mentioned or, in this case, that the GEO Group' logo may be visible, is not sufficient.  The question of whether a plaintiff is "identifiable" is a separate and distinct issue from whether the substance of the publication constitutes a defamatory assertion "of and concerning" the plaintiff.  *Cf. McIver v. Tallahassee Democrat, Inc.*, 489 So. 2d 793, 794 (Fla. DCA 1986) (holding even though Southeastern Realty was expressly named in newspaper article, "the entire substance of the publication about the alleged incident was the presumed unlawful action by the individual McIver," and therefore there was no defamatory statement "of and concerning" Southeastern Realty).

---

[2] Knowing this, GEO Transport resorts to the hail-Mary of "leaving it to the trier of fact."  Whether a statement is susceptible to defamatory interpretation is, however, a question of law for the court which can be determined at the motion to dismiss stage.  *Turner v. Wells*, 879 F.3d 1254, 1262–63 (11th Cir. 2018) (citation omitted).

GEO Group would have the Court believe that episode four of *Messiah*, which depicts multiple interlocking government agencies scrutinizing the al-Masih character's intentions and motivations, and makes ***no mention*** of GEO Group, is reasonably viewed by an average viewer as making a statement "of and concerning" GEO Group.  As is clear from the relevant episodes of *Messiah* (episodes three and four), if there is a statement made, it is about agencies of the United States government: Al-Masih is initially arrested by a DHS officer in episode three (DVD Ex., Disc 5, 25:32-25:44); in the next episode he is transported to the detention facility in a van prominently marked with the DHS logo (DVD Ex., Disc 5, 41:01-41:07); the DHS officer appears to have unfettered access to the immigration detention facility in episode four, for example observing al-Masih and other detained immigrants in the main holding area without a GEO Group guard in sight (DVD Ex., Disc 5, 43:13-43:33); he even has sufficient access to the interrogation rooms to plant an audio device.  (DVD Ex., Disc 5, 54:17-54:38).

While GEO Group asserts in its Opposition that "no reasonable viewer," of *Messiah* would think that a Department of Justice attorney had decision-making power over the conditions in which immigrants were detained, (D.E. 38 at 7), a DOJ attorney enters the detention facility's security control room unannounced in episode four, uses the monitors to observe al-Masih while in custody (DVD Ex., Disc 5, 1:11:24-1:11:53) and it is the DOJ attorney who is prosecuting al-Masih.  The focus of the episode is whether to prosecute or release al-Masih; there is no focus or discussion about the "conditions" at the facility and certainly no discussion concerning GEO Group. The presence of a GEO patch on the security guard's arm in that scene (if one even notices it) is incidental to creating a sense of contemporary time and place; it is no more defamatory towards GEO Group than towards Dunkin Donuts (whose logo is visible on the coffee cup the DOJ attorney hands to the security guard).

A review of the series, and episode four in particular, in context within the broader series, reveals that *Messiah* is not attempting to make any specific statement "of and concerning," GEO Group.  Rather, the television series explores the nature of religious belief, and how governments

(the United States government in particular) react to religious movements.  *Messiah* is not "about" GEO Group any more than it is "about" the General Motors vehicles used to transport al-Masih to the facility, or "about" the cell phones on which social media is showcased, and on that basis, its defamation claim should be dismissed.

## **CONCLUSION**

For the foregoing reasons, Netflix respectfully requests that this Court enter an order dismissing Plaintiffs' complaint in its entirety, with prejudice, and provide such other and further relief as the Court deems just and proper.

Dated: October 7, 2020

**PRYOR CASHMAN LLP**
*Attorneys for Netflix, Inc.*
Ilene S. Farkas (admitted *pro hac vice*)
James G. Sammataro
Michael B. Adelman (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 2700
Miami, Florida 33131
Telephone: (786) 582-3011
Facsimile:  (786) 582-3004

*s/ James G. Sammataro*
Florida Bar No. 520292

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on October 7, 2020, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system, which will send Notices of

Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro