**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 9:20-cv-80847-AMC-DLB**

THE GEO GROUP, INC. and
GEO TRANSPORT, INC.

                  Plaintiffs,

v.

NETFLIX, INC.,

                  Defendant.

_____/


**DEFENDANT NETFLIX, INC.'S OBJECTIONS TO MAGISTRATE JUDGE**
**BRANNON'S APRIL 13, 2021 ORDER ON DISCOVERY DISPUTE**

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Magistrate Judge Rule 4(a) of the Local Rules, defendant Netflix, Inc. ("Netflix") hereby submits these objections to Magistrate Judge Brannon's April 13, 2021 Order on Defendant's Discovery Dispute (the "Discovery Order"). [D.E. 60.] Netflix respectfully requests that the District Court set aside the Discovery Order to the extent that it denied Netflix's requests which seek information directly relevant to Plaintiffs' allegations and damage claims, and thus is clearly erroneous and contrary to law. Netflix respectfully requests that the Court order plaintiffs The GEO Group, Inc. ("GEO Group") and GEO Transport, Inc. ("GEO Transport" and collectively, "GEO" or "Plaintiffs") to produce responsive information relating to matters they have expressly placed at issue.

## PRELIMINARY STATEMENT

Plaintiffs have asserted twelve claims against Netflix based on a few scattered scenes in two episodes of a fictional television show, *Messiah*, that total twenty-eight seconds. Plaintiffs claim that these scenes cast them in a defamatory light, and have claimed *$50 million in harm to their alleged "world class" reputation* and goodwill associated with their immigrant detention facilities, *because*:

- GEO Group "has built a reputation and goodwill on its commitment to respecting the human rights of detained immigrants in its care" [D.E. 1 ¶ 8];

- GEO Group "operates state-of-the-art Facilities that provide safe, secure, and humane environments" [*id*. ¶ 15];

- GEO Facilities have "comprehensive world class medical, dental, and mental health care including a daily sick call and 24-hour emergency care" [*id*. ¶ 42];

- "GEO Facilities . . . are air conditioned, and offer recreational, educational, and spiritual amenities" [*id*. ¶ 40];

- Plaintiffs have a "global human rights policy and human rights training module" [*id*. ¶ 43];

- "Upon arrival at a GEO Facility, each person is given his or her own bed, bedding, and a handbook that provides information 'regarding everything from intake to release, with an

emphasis on how to access information requests, grievances, medical care, legal services, food services, education, telephone, visitation and recreation'" [*id.* ¶ 16];

- "GEO Facilities provide soccer fields, gymnasiums, and other recreational spaces" [*id.* ¶ 17];

- GEO provides "libraries, classrooms and computers" and "indoor and outdoor spaces where people can sit and socialize." [*Id.* ¶ 18-19.]

GEO Group claims it has "spent decades earning a good reputation as a company that operates state-of-the-art immigrant detention facilities" (Ex. D, GEO Group Interrogatory Response No. 16), and that the use of the GEO name in *Messiah* has caused $50 million in damages to their "reputation" and associated goodwill (Ex. G at 6). [*See, e.g.*, D.E. ¶¶ 48-49, 59, 70.] Plaintiffs allege that Netflix knew or should have known that these allegations and photos truly depict the nature of GEO facilities and that Netflix acted with "actual malice." Yet Plaintiffs refuse to allow (and the Discovery Order prevents) Netflix discovery to test these allegations.

In support of their supposed pristine (and supposedly damaged) reputation, Plaintiffs included a host of curated, glossy photos of (conspicuously) unidentified, uninhabited facilities in their Complaint. Plaintiffs claim that – notwithstanding the litany of publicly-available materials regarding GEO's repeated human rights violations – Netflix acted with "actual malice" because research into GEO Group would have "revealed" that GEO's real-life facilities are consistent with the curated photos captured in their Complaint, and do not bear any resemblance to *Messiah*'s fictional facility.[1] Yet Plaintiffs refuse to allow Netflix to test the alleged "real life" conditions of their facilities as alleged in their Complaint.

Netflix's requests were tailored to seek documents needed to challenge Plaintiffs' descriptions of their facilities – as substantial truth is a defense – the value of their reputation and

---

[1] Plaintiffs have yet to produce a single photograph of actual conditions in any facilities while in operation.

their treatment of detainees.  Instead, Plaintiffs claimed that Netflix is limited to information solely concerning the ***specific*** conditions that Plaintiffs placed "at issue" – *i.e.*, their allegation that *Messiah* "falsely accuses GEO of detaining immigrants in overcrowded overheated rooms with chain-link cages and depriving them of beds, bedding, sunshine, recreation and educational opportunities."  [D.E. 1 ¶ 1.]  According to GEO (with which the Magistrate erroneously agreed), Netflix is not entitled to conduct discovery into any other conditions and, thus, not entitled to probe GEO's supposed "world class" reputation and goodwill, even though Plaintiffs clearly intend to use their own self-serving "evidence" of their reputation to support their (nonexistent) damages.

This is not the law.   Nor can it be, as discovery is far broader and extends to all relevant information.

Discovery into the "real conditions" of GEO facilities will vitiate the very basis for their damages claim.  Publicly available reports detail that:

- 75% of the cells visited at a GEO detention center had "braided bedsheets, referred to as 'nooses' by center staff and detainees" hanging from the ceiling, which were called "***suicide failures***" by the GEO guards (Dep't of Homeland Sec. Off. of Inspector Gen., OIG-18-86, *Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California* (2018) at 2-3 (emphasis added));

- Detainees do not "receive appropriate and necessary medical and dental care, as required by ICE standards" (*id.* at 7);

- Over 70% of detainees never even had contact with a doctor and were not spoken to in their native language (*id.*); and

- GEO's food service "endanger[ed] detainee health and welfare."  (Dep't of Homeland Sec. Off. of Inspector Gen., OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (2019) at 3.)

These investigations into the real conditions at GEO's facilities stand in sharp contrast to GEO's curated photos of its facilities and professed reputation.   The true state of GEO's facilities

is indisputably relevant to GEO's claims of a damaged reputation (and to whether Plaintiffs are libel-proof), and go directly to the heart of Netflix's defenses, including substantial truth.

Having placed the value of their alleged "goodwill" and reputation squarely at issue, Plaintiffs are not entitled to handpick a handful of "best of" conditions that they believe cast their reputation in the best light, while shielding the rest of the conditions from discovery.  Plaintiffs cannot both simultaneously accuse Netflix of avoiding or intentionally disregarding "publicly available sources" about the state of GEO facilities and refuse discovery into what these sources (as well as GEO's internal documents) will reveal.  Netflix is also entitled to test the veracity of the very allegations that Plaintiffs have put into issue in this case.  Precluding it from doing so results in manifest injustice.  [D.E. 1 ¶ 45.][2]

It is respectfully submitted that the Magistrate's Order be modified to GRANT Netflix's application in its entirety and compel Plaintiffs' to produce the requested information.

## FACTUAL AND PROCEDURAL BACKGROUND

A.   **GEO Group and GEO Transport Sue Over the Depiction of a Fictional Immigrant Detention Center in *Messiah*.**

Released exclusively on Netflix on January 1, 2020, *Messiah* is an entirely fictional, plot-driven thriller that, over its ten episodes, imagines how the modern world would react to a messianic figure who seems to perform miracles and whose followers view him as a savior.  At one point in episode three, GEO Transport's logo appears in the background, on a bus, for less than two seconds in a scene that depicts the aftermath of a tornado.  In episode four, GEO Group's logo is used (mostly blurred or otherwise imperceptible) four times for a collective total of twenty-six seconds.  Like the appearance of GEO Transport's logo, each appearance of GEO Group's logo

---

[2] While GEO Transport has asserted six claims of its own sounding in trademark infringement and defamation, it has yet to articulate any statement that defamed them or how it has been damaged whatsoever.  Neither Plaintiff has produced a single document supporting any theory of damages.

is buried in the background and never the focus of the scene.  In a handful of scenes, the main character is transported by a Department of Homeland Security van (not a GEO van) to an unnamed facility, and once there, interrogated by a CIA officer. Each episode ends with a disclaimer in the credits that "[t]he characters and events depicted in this program are fictitious. No depiction of actual persons or events is intended."

Nevertheless, Plaintiffs assert twelve claims against Netflix (six claims each), based on their belief that this fictional show falsely accused Plaintiffs of "detaining immigrants in overcrowded overheated rooms with chain-link cages and depriving them of beds, bedding, sunshine, recreation, and educational opportunities."  [D.E. ¶ 1.]  In support of the claimed reputational harm, Plaintiffs' Complaint is replete with glossy marketing photos, which are likely staged and contain no humans in them, that purport to show the true conditions at Plaintiffs' facilities.  [*See, e.g.*, *Id.*  ¶¶ 2, 17-20.]

GEO Group claims it has "spent decades earning a good reputation as a company that operates state-of-the-art immigrant detention facilities" (Ex. D, GEO Group Interrogatory Response No. 16), and that it has been damaged because it "has built a reputation and goodwill on its commitment to respecting the human rights of detained immigrants in its care" [D.E. 1 ¶ 8] and "operates state-of-the-art Facilities that provide safe, secure, and humane environments" [D.E. 1 ¶ 15] that have "comprehensive world class medical, dental, and mental health care including a daily sick call and 24-hour emergency care" [D.E. 1 ¶ 42].

Plaintiffs allege that Netflix knew or should have known that these allegations and photos truly depict the nature of GEO facilities and that Netflix "knew" their depiction of the fictional facilities was false.  [D.E. ¶ 37.]  Because *Messiah*'s fictional facility lacks country club-quality

soccer fields, board games, spiritual amenities and superior medical, dental and mental health care, Plaintiffs contend their "world class" reputation has been damaged to the tune of $50 million.[3]

**B.**   **GEO Group and GEO Transport Object to the Discovery Requests at Issue.**

On January 28, 2021, Netflix served discovery requests on Plaintiffs seeking information regarding the veracity of these allegations.  At issue here are the following discovery requests (the "Requests" seeking the "Requested Information"):

- GEO Group Request No. 6 (seeking documents or communications regarding "any investigations, claims, complaints or demands regarding furniture provided to detainees at any GEO Group facility");

- GEO Group Request No. 8 (seeking same regarding "the alleged or actual use of solitary confinement for detainees at any GEO Group facility");

- GEO Group Request No. 9 (seeking same regarding "medical care given to or withheld from detainees at any GEO Group facility");

- GEO Group Request No. 14 (seeking same, "[t]o the extent not covered in the above requests", regarding "the alleged or actual conditions at any GEO Group facility and/or the treatment of detainees" at a GEO Group facility);

- GEO Group Request No. 15 and GEO Transport Request No. 7 (seeking documents or communications from or with any "government agency or civil rights group regarding conditions for detainees [at GEO Group facilities/in the custody or care of GEO Transport] and any investigations, claims, complaints or demands related thereto");

- GEO Group Request No. 16 and GEO Transport Request No. 8 (seeking "[a]ny newspaper, periodical, journalist, or media reporting in [GEO Group's/GEO Transport's] possession, custody, or control regarding [GEO Group/GEO Transport]");

- GEO Transport Request No. 5 (seeking documents "concerning any investigations, claims, complaints or demands, whether resolved, disputed or litigated, regarding the alleged or actual conditions of any GEO Transport facilities or vehicles and/or the treatment of detainees while in the custody or care of GEO Transport"); and

- GEO Group Interrogatory No. 4 and GEO Transport Interrogatory No. 4 (requesting that Plaintiffs "[i]dentify all claims, complaints, actions, investigations or litigations involving [GEO Group/GEO Transport] regarding conditions of detention or the rights of detainees").

---

[3] Again, GEO Transport has not articulated any theory of damages, much less how they have been defamed by the one or two seconds a GEO Transport bus appears amidst the wreckage of a tornado.

Plaintiffs objected to each of the above-referenced requests as "overly broad" for the same reason:  "because it is not limited to the conditions at issue in this case, namely whether GEO houses people day and night in overcrowded rooms with chain-link cages and no beds (it does not) or whether GEO provides people with beds, air conditioning, recreational spaces like soccer fields and gymnasiums, and educational spaces like classrooms and libraries (it does)." (*See, e.g.*, Ex. C, Response and Objection to Request No. 5.)[4]  That is, despite the sweeping allegations in Plaintiffs' Complaint about their "world class" treatment of detainees, the spiritual, medical and mental health services they provide, their commitment to human rights, the photos which show how *Messiah* should have portrayed them, and the alleged resulting $50 million in damages, Plaintiffs have refused to reveal any information about this "world class" reputation or otherwise

---

[4] Publicly available documents seriously question Plaintiffs' feigned cries of falsity.  For example:

- In one GEO facility, "[f]emale detainees also noted that officers had placed them into segregation units as a result of overcrowding in the facility, a clearly impermissible use of segregation. Leslie, a Honduran detainee who simply wants to return home, said: 'I was taken to solitary because there was no space. . . . [T]hey wanted to bring men into our unit. I was there for a whole week. I had no access to anything.'" (SOUTHERN POVERTY LAW CENTER, *Shadow Prisons: Immigrant Detention in the South* (Nov. 21, 2016), https://www.splcenter.org/20161121/shadow-prisons-immigrant-detention-south.)
- The investigation also found that detainees "reported difficulty receiving other necessary items, including underwear, towels and blankets from authorities." (*Id.*)
- Detainees at LaSalle "reported that temperatures in the living areas – or 'pods' – fluctuated greatly, with some saying their rooms were very cold, while in other pods, it was too hot. Detainees reported that the air conditioning units were turned off during the weekends." (*Id.*)
- Center for Victims of Torture reports that "Beza, a Christian woman fleeing religious persecution in Eritrea, arrived at the U.S. port of entry at Hidalgo, TX, and asked for protection."  GEO operates the East Hidalgo Detention Facility.  Beza states that she "was there for 24 hours with nothing—no blanket or mattress, just a cement bench. It was so cold." (CENTER FOR VICTIMS OF TORTURE, *Tortured & Detained: Survivor Stories of U.S. Immigration Detention* (Nov. 2013), https://www.cvt.org/sites/default/files/Report_TorturedAndDetained_Nov2013.pdf.)

permit Netflix or the trier of fact to challenge not only the falsity of these statements, but whether *Messiah* in any way caused any damage to their "reputation" – not to mention any challenge into what their reputation and goodwill actually may be.[5]

And while Plaintiffs accuse Netflix of actual malice – that Netflix allegedly "knew" or "should have known" through research that their depiction of the facilities was false and damaging to their reputation – Plaintiffs refuse to reveal what that research would have shown.  Rather, they want to be able to allege what they want, and show glossy photos of unidentified and uninhabited facilities as a sword, and use one sentence in their Complaint as a shield, ignoring the rest of their own allegations.  The information sought is discoverable based on Plaintiffs' own allegations.

**C.    Magistrate Judge Brannon Limits Discovery To Certain Allegations in the Complaint, While Ignoring Other Allegations Contained in the Complaint.**

On March 11, 2021, the parties met and conferred on these issues, but Plaintiffs maintained that discovery should be limited to conditions such as "bedding" and "air conditioning" despite Plaintiffs' reliance on a host of other "amenities" and their undisputed intentions of placing their "world class" reputation at issue.  Thereafter, on March 25, 2021 and pursuant to the Court's Order Setting Discovery Procedure [D.E. 48], Netflix brought this dispute to Magistrate Judge Brannon.[6] On April 13, 2021, Magistrate Judge Brannon canceled the April 15, 2021 hearing and determined that the Requests were "overbroad" based solely on the finding that these requests sought

---

[5] As set forth herein, publicly available information shows that GEO Group's reputation was so toxic that Florida Atlantic University was forced to refuse GEO's $6 million sponsorship of their sports stadium given the protests that broke out in the community; a public relations firm hired to rehabilitate them could not tolerate the public backlash of being associated with them; banks refused to do business with them; and GEO's own shareholders insisted that GEO adopt a human rights policy.

[6] Pursuant to the Court's Order Setting Discovery Procedure [D.E. 48], the parties' discovery memoranda (Exs. A and B) and accompanying exhibits (Exs. C-F) are attached to these objections.

information that was "beyond the scope of discovery based on the allegations in the complaint."[7] [D.E. 60 at 3.]  There was no showing or finding of burden or lack of proportionality to the needs of the case.  Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Magistrate Judge Rule 4(a) of the Local Rules, Netflix timely filed these objections to the Discovery Order.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 72(a) provides that, when timely objections are made to a magistrate judge's order on a pretrial, non-dispositive matter, "[t]he district judge in the case must . . . modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Holton v. City of Thomasville Sch. Dist.*, 425 F.3d 1325, 1350 (11th Cir. 2005) (internal quotations omitted).  "A ruling is contrary to law if the magistrate judge has misinterpreted or misapplied applicable law." *Root ex rel. A.R. v. Dudek*, 151 F. Supp. 3d 1309, 1312 (S.D. Fla. 2015) (internal quotations omitted).

## ARGUMENT

### A.    Legal Standard

"The Federal Rules of Civil Procedure strongly favor full discovery whenever possible." *Farnsworth v. Procter Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985).  The "overall purpose of discovery under the Federal Rules is to require the disclosure of all relevant information, so that the ultimate resolution of disputed issues in any civil action may be based on a full and accurate understanding of the true facts, and therefore embody a fair and just result." *State Nat'l Ins. Co.*

---

[7] Magistrate Judge Brannon granted Netflix's request for three discovery requests and limited Plaintiffs' required response to six Requests to certain conditions at Plaintiffs' facilities. No responsive documents have been produced by either Plaintiff.

*v. City of Destin*, No. 3:15cv31-MCR-EMT, 2015 WL 11109379, at *1 (N.D. Fla. Sept. 1, 2015).

Rule 26(b)(1) of the Federal Rules of Civil Procedure defines the scope of discovery as "any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case", considering the importance of the issues at stake, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery, and whether the burden of the discovery outweighs the likely benefit.  Fed. R. Civ. P. 26(b)(1).  "It is well established that the courts must employ a liberal standard in keeping with the purpose of the discovery rules." *Kadiyala v. Pupke*, No. 17-80732-CIV, 2019 WL 3752654, at *2 (S.D. Fla. Aug. 8, 2019).

"The party resisting production of information bears the burden of establishing lack of relevancy or undue burden in supplying the requested information." *Birster v. Am. Home Mortg. Servicing, Inc.*, No. 10-80735-CIV, 2012 WL 12854863, at *5 (S.D. Fla. Dec. 3, 2012).  In other words, the party resisting production "must show either that the requested discovery (1) does not come within the broad scope of relevance as defined under Rule 26 or (2) is of such marginal relevance that the potential harm occasioned by discovery would far outweigh the ordinary presumption in favor of broad disclosure." *Jeld-Wen, Inc. v. Nebula Glass Int'l, Inc.*, No. 05-60860-CIV, 2007 WL 1526649, at *2 (S.D. Fla. May 22, 2007).

District courts sustain objections to discovery orders where the magistrate judge misapplies Rule 26.  *See Matter of Application of O'Keeffe*, 184 F. Supp. 3d 1362, 1370 (S.D. Fla.), *aff'd sub nom. In re O'Keeffe*, 660 F. App'x 871 (11th Cir. 2016) (vacating magistrate's discovery order as "clearly erroneous and contrary to law" because the information sought in discovery was "relevant" to libel defense and "there has been an insufficient showing that the burden or expense, if any, of the proposed discovery outweighs the likely benefits"); *Ballew v. City of Pasadena*, No. CV 18-

0712-FMO-ASX, 2019 WL 9341338, at *4 (C.D. Cal. June 10, 2019) (overruling magistrate judge's order because the information sought was "clearly relevant" to plaintiff's claims); *York v. Wellmark, Inc.*, No. 4: 16-cv-627-RGE-CFB, 2018 WL 8786384, at *6 (S.D. Iowa Apr. 17, 2018) (holding that the magistrate judge's order was "clearly erroneous" because the discovery requests at issue "are likely to produce relevant information and are proportional to the needs of the case").

**B.      The Discovery Order is Contrary to Law Because It Fails to Address the Proportionality Factors.**

Rule 26(b)(1) outlines six factors that must be considered in determining whether discovery is "proportional to the needs of the case", including "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  "In determining proportionality, the factors *must be considered*."  *Mackay v. Creative Hairdressers, Inc.*, 3:17-CV-421-J-32MCR, 2018 WL 7457849, at *2 (M.D. Fla. June 29, 2018) (emphasis added).  The Discovery Order failed to consider any of the proportionality factors or otherwise engage in any meaningful analysis as to whether the Requested Information is proportional to the needs of the case.  Nor did Plaintiffs demonstrate that the Requested Information was not proportional; indeed, they did not even make the argument or object on that basis.  Nor could they, as their own allegations and damages theory place this information squarely at issue.

**C.      The Discovery Order is Clearly Erroneous Because the Requested Information is Plainly Discoverable Based on Plaintiffs' Claims and Damages Theories.**

The Discovery Order's application of Rule 26 is clearly erroneous to the extent it holds that Netflix's Requests were "beyond the scope of discovery" or "overbroad."

**1.      <u>The Requested Information is Relevant.</u>**

Under Rule 26, "relevance is construed broadly to encompass any matter that bears on, or

that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Mackay*, 2018 WL 7457849, at *1. "Accordingly, discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought has no possible bearing on the claims and defenses of the parties or otherwise on the subject matter of the action." *Jeld-Wen, Inc.*, 2007 WL 1526649, at *1. "[T]he scope of discovery is much broader than simply to prove the factual allegations in the . . . Complaint." *Stanecki v. Turning Point Cap., Inc.*, No. 12-CV-02812-MSK-KLM, 2013 WL 1966917, at *2 (D. Colo. May 13, 2013). "At a minimum, therefore, the pleadings are the starting point from which relevancy and discoverability are determined." *Nat'l Credit Union Admin. v. First Union Cap. Markets Corp.*, 189 F.R.D. 158, 161 (D. Md. 1999). Courts routinely order the production of discovery where, as here, the requests are directly related to allegations in the pleadings. *See, e.g.*, *Birster v. Am. Home Mortg. Servicing, Inc.*, No. 10-80735-CIV, 2012 WL 12854863, at *6 (S.D. Fla. Dec. 3, 2012) (granting motion to compel documents regarding surveillance of plaintiffs' property because "this request is directly relevant to the Amended Complaint, which alleges that AHMSI's home inspections violated the FDCPA"); *Action Nissan, Inc. v. Hyundai Motor Am.*, 2008 WL 111307, at *2 (M.D. Fla. Jan. 8, 2008) (same because the "documents are directly relevant to [plaintiff's] allegation that [defendant] failed to comply with the provision of the franchise agreement that required [defendant] to provide [plaintiff] with an explanation of the method used to distribute such products").

The Requests seek relevant information – and certainly meet the threshold of possibly bearing on the claims and defenses – for at least two reasons.[8] *First*, the Requested Information is

---

[8] Indeed, there is no rhyme or reason to Plaintiffs' cherry-picked list of "conditions at issue." The list is broader than what is actually depicted in *Messiah* (for example, there is no depiction or discussion in *Messiah* of recreational space or educational facilities at the fictional detention facility in any form), but it is narrower than the conditions discussed in Plaintiffs' Complaint (for

relevant to the truth, substantial truth or falsity of the depiction of the (fictional) facility or alleged "statements" in *Messiah*.[9]  *See Readon v. WPLG, LLC*, No. 3D20-340, 2021 WL 1395240, at *2 (Fla. Dist. Ct. App. Apr. 14, 2021) (affirming dismissal of defamation claims as substantially true); *Smith v. Cuban Am. Nat. Found.*, 731 So. 2d 702, 707 (Fla. Dist. Ct. App. 1999) ("[F]alsity only exists if the publication is substantially and materially false.").  And truth or substantial truth is a defense to such claims.  *See Blasi v. Simonetti*, No. 05-80231-CIV, 2005 WL 8156013, at *2 (S.D. Fla. Nov. 10, 2005) (compelling production of information relevant to the "truth defense" because "[a] defendant charged with defamation is entitled to reasonable discovery as to relevant matters to obtain evidence to support such a defense").  Discovery into all facilities is relevant because even if the conditions at one facility proved the truth or substantial truth of the alleged "statements", Plaintiffs' claims would fail.  Indeed, "[u]nder the substantial truth doctrine, a statement does not have to be perfectly accurate if the 'gist' or the 'sting' of the statement is true." *Readon*, 2021 WL 1395240, at *2 (quoting *Masson v. New Yorker Mag.*, 501 U.S. 496, 517 (1991)). As long as a report is substantially correct, "[i]t is not necessary that it be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting." *Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502-03 (Fla. Dist. Ct. App. 1993) (quoting Restatement (Second) of Torts § 611, cmt. f (1977)).  Netflix is entitled to discovery into its defenses, yet the Magistrate's Order limits discovery to the exact, literal alleged "truth" which is contrary to Florida defamation law and the broad rules of discovery.

---

example, Plaintiffs allege that GEO Group facilities have "comprehensive world class medical, dental, and mental health care").  [D.E. 1 ¶ 42.]

[9] While not relevant on this discovery motion, as set forth in Netflix's pending Motion to Dismiss, there was no "statement" "of and concerning" Plaintiffs in this fictional television show.  But so long as Plaintiffs' claims exist, Netflix is entitled to seek discovery into these allegations.

Moreover, when it suits them, Plaintiffs describe their alleged "true" conditions and amenities *beyond the purported "conditions at issue"* and allege that these "rebut Netflix's defamatory falsehoods" [D.E. 1 ¶ 44], and support their allegations that Netflix acted with reckless disregard for the "truth" about their facilities.  Plaintiffs allege that had Netflix done its research, it would have learned that: (1) "GEO Facilities . . . offer . . . spiritual amenities" [*id.* ¶ 40][10]; (2) GEO Facilities have "comprehensive world class medical, dental, and mental health care including a daily sick call and 24-hour emergency care" [*id.* ¶ 42]; and (3) GEO "respect[s] the human rights of everyone in its care" and has a "global human rights policy and human rights training module" [*id.* ¶ 43].  In support of their "world class" amenities and impeccable reputation, Plaintiffs include color photos of unidentified (and, it appears, uninhabited) facilities which supposedly represent the true conditions at their facilities.  [*See, e.g.*, *Id.* ¶¶ 2, 17-20.]  Plaintiffs have claimed they have been defamed because these photos supposedly represent the "real conditions" at their facilities.  Yet, at the same time, they are refusing discovery into those "real conditions."

The Requested Information is directly targeted at these allegations in the Complaint.  (*See, e.g.*, Ex. C Request No. 9 (seeking documents regarding "medical care given to or withheld from detainees"); Request No. 6 (seeking documents regarding "furniture provided to detainees"); Request No. 8 (seeking documents regarding "use of solitary confinement for detainees").)

Netflix is entitled to discovery into the supposedly "real conditions" to rebut Plaintiffs' claims of defamation and what Netflix should have known.  [D.E. 1 ¶ 45.]

*Second*, the Requested Information is relevant to Plaintiffs' alleged $50 million in damages

---

[10] For another example of Plaintiff's inconsistent cherry-picking, "spiritual amenities" was not on their list of "conditions at issue", yet Plaintiffs agreed to conduct a reasonable search for documents pertaining to "spiritual amenities."  (*See* Ex. C, Response and Objection to Request No. 11.)

to its "world class" reputation and goodwill.[11]  Plaintiffs allege that they have "built a reputation and goodwill on [their] commitment to respecting the human rights of detained immigrants in [their] care."  [*Id.* ¶ 8.]  Plaintiffs have asserted that they have "spent decades earning a good reputation as a company that operates state-of-the-art immigration detention facilities…" (Ex. D, GEO Group Interrogatory Response No. 16.)  Plaintiffs claim that, with *Messiah*, Netflix sought to "***destroy*** the very goodwill that trademark protection is intended to protect."  [D.E. 38 at 8.]

Consequently, documents concerning public perception, the value of Plaintiffs' actual reputation and goodwill, if any, associated with the GEO brand both before and after the release of *Messiah* are absolutely relevant and central to this case.  *See Orange Lake Country Club, Inc. v. Reed Hein & Assocs., LLC*, No. 6: 17-CV-1542-ORL-DCI, 2019 WL 7423511, at *3 (M.D. Fla. Feb. 7, 2019) (ordering "discovery [that] is relevant . . . to Plaintiffs' alleged reputational" harm because "Plaintiffs have placed damage to their reputation at issue"); *see also Stewart & Stevenson Servs., Inc. v. Pickard*, 749 F.2d 635, 649 (11th Cir. 1984) ("It is axiomatic that the measure of damage to business property, such as goodwill, is based on a measurement of the difference in value of the property before and after the injury.").

As discussed above, if discovery into the "real conditions" at GEO facilities show that:

- contrary to Plaintiffs' claims of "state of the art" medical and mental health care, 75% of the cells visited had "braided bedsheets, referred to as 'nooses' by center staff and detainees" hanging from the ceiling, which were called "suicide failures" by the GEO guards (Dep't of Homeland Sec. Off. of Inspector Gen., OIG-18-86, *Issues Requiring Action at the Adelanto ICE Processing Center in Adelanto, California* (2018) at 2-3); or that

---

[11] [*See* D.E. 1 ¶ 48 ("Netflix's false accusations about GEO have damaged GEO's reputation and tarnished the GEO Trademarks."); ¶ 49 ("Netflix's misuse of the GEO Trademarks in connection with the facility featured in *Messiah* has confused and deceived the public . . . to the damage and detriment of GEO's reputation, goodwill, and profits."); ¶ 59 ("As a direct and foreseeable result of Netflix's false and defamatory accusations, GEO has suffered reputational harm."); ¶ 70 ("GEO has been harmed reputationally by Netflix's use of the GEO Trademarks and should be awarded damages in an amount to be determined at trial.").]

- contrary to Plaintiffs' allegations of "world class medical care", investigations showed detainees do not "receive appropriate and necessary medical and dental care, as required by ICE standards" and that one investigation showed that over 70% of detainees never even had contact with a doctor and were not spoken to in their native language (*id.* at 7); or that

- food issues "endanger[ed] detainee health and welfare", including spoiled and moldy food (Dep't of Homeland Sec. Off. of Inspector Gen., OIG-19-47, *Concerns about ICE Detainee Treatment and Care at Four Detention Facilities* (2019) at 3), then certainly discovery into Plaintiffs' reputation and facilities bears on issues Plaintiffs have put in dispute.

By denying Netflix discovery into Plaintiffs' alleged facilities and reputation, and what Netflix should have known, the Magistrate essentially held that these issues have "no possible bearing" on whether something other than the twenty-eight seconds of imperceptible use of the GEO marks in a fictional show may have impacted any loss in goodwill that Plaintiffs may argue occurred during the relevant time period.  Discovery into whether GEO's "world class" reputation for "respecting human rights" is or is not what they allege in their Complaint is absolutely at issue, having been placed there by Plaintiffs, and certainly has a possible bearing on whether there are other factors that go into valuing GEO's reputation and goodwill beyond *Messiah.*

Indeed, discovery into whether GEO is defamation-proof is entirely proper.  Below are just a few examples – all of which took place prior to January 1, 2020 – regarding the public's pre-*Messiah* opinion of GEO:

- In 2013, Florida Atlantic University announced that it would name its sports stadium after GEO Group, which "secured the naming rights with a $6 million gift."  (Greg Bishop, *A Company That Runs Prisons Will Have Its Name on a Stadium*, N.Y. TIMES (Feb. 19, 2013).)  That announcement immediately "generated protests across FAU's campus", "picketing outside [the president's] office and harassment across campus from protestors who disagreed with FAU's relationship to the private prison company."  (Chip Patterson, *GEO Group withdraws naming rights for FAU Stadium*, CBS Sports (Apr. 2 2013), https://www.cbssports.com/college-football/news/geo-group-withdraws-naming-rights-gift-for-fau-stadium.)  "The students, faculty, and alumni who voiced their specific concerns often accused the GEO Group of human rights violations at its facilities."  (*Id.*)  As a result of the public pressure, GEO Group withdrew its naming rights.

- In 2019, GEO Group hired Edelman, a public relations giant, "to reshape the GEO Group's public image by 'proactively correcting the record' with a new narrative."  (Tiffany Hsu,

*Edelman, Public Relations Giant, Drops Client Over Border Detention Centers*, N.Y. TIMES (June 30, 2019).)  The news that Edelman took on GEO as a client leaked, "leaving one of the world's leading public relations firms with a potential public relations crisis." (*Id.*)  When the employees at Edelman found out that their company was hired by GEO, Edelman's "employees staged a revolt, which led to Edelman firing GEO Group as a client."  (Cory Doctorow, *Edelman PR drops GEO Group after employee revolt at the prospect of laundering the reputation of private US concentration camps* (Aug. 4, 2019), https://boingboing.net/2019/08/04/geo-group-too-filthy-for-edelm.html.)  In other words, GEO's reputation was so toxic that even a public relations firm hired to rehabilitate them could not tolerate the public backlash of being associated with them.

- In 2019, "in the wake of demands by grassroots activists . . . shareholders, policymakers, and investors", "[a]ll of the publicly known existing banking partners providing lines of credit and term loans to private prison leader GEO Group" had "officially committed to ending ties with" GEO.  (Morgan Simon, *GEO Group Running Out of Banks as 100% of Known Banking Partners Say 'No' to the Private Prison Sector*, FORBES (Sept. 30, 2019), https://www.forbes.com/sites/morgansimon/2019/09/30/geo-group-runs-out-of-banks-as-100-of-banking-partners-say-no-to-the-private-prison-sector/.)  The financial boycotting of GEO included major banks such as JPMorgan Chase, Wells Fargo, Bank of America, BNP Paribas, SunTrust, and Barclays.  (*See id.*)

- In 2019, GEO's own investors forced it "to adopt a shareholder resolution requiring [it] to issue a report on implementation of its human rights policy."  (David M. Reutter & Kevin Bliss, *GEO Group Under Pressure from Shareholders on Human Rights Policy*, PRISON LEGAL NEWS (Sept. 5, 2019), https://www.prisonlegalnews.org/news/2019/sep/5/geo-group-under-pressure-shareholders-human-rights-policy/.)  GEO objected initially by submitting a letter to the SEC objecting to the resolution but ultimately were forced to accede to report on their human rights policy compliance.  GEO did, however, successfully block another resolution which was aimed at prohibiting GEO from separating immigrant children from their parents.  (*See id.*)

If Plaintiffs' reputation is so toxic that a sports stadium refused their $6 million sponsorship offer, or a public relations firm was forced to fire them as a client after the public backlash given their perceived human rights violations, or their own shareholders forced them to adopt a human rights policy, would not that have some bearing on the amount (if any) of damages Plaintiffs can claim from an alleged failure to highlight their bunkbeds?

The Discovery Order omitted any reference to Plaintiffs' claims of damages, their description of their harmed reputation that was supposedly "world class", or Netflix's right and ability to challenge what it "should have known" about Plaintiffs' facilities and reputation.  The

Discovery Order contained no analysis whatsoever of the connection between the Requests and those allegations in the Complaint and restricted Netflix from discovery into those allegations.

2.    __The Requested Information is Proportional to the Needs of the Case__.

The Discovery Order contained no analysis of whether the Requests were proportional to the needs of case.  And, despite "the party resisting discovery ha[ving] a heavy burden of showing why the requested discovery should not be permitted", *John v. Keller Williams Realty, Inc.*, 619-cv-1347, 2019 WL 7482200, at *1 (M.D. Fla. Nov. 19, 2019), Plaintiffs did not even mention, let alone demonstrate, that the Requests were not proportional.  (*See* Ex. B.)  Nor could they given their own allegations of reputational harm and what Netflix should be charged with "knowing" about the "true" state of the "amenities" offered at their facilities.  A consideration of the six proportionality factors mandates a conclusion that the Requests are proportional to the needs of the case; that the Discovery Order did not reach that conclusion was clear error.

*First*, this case raises significant and important issues concerning the First Amendment. Based on twenty-eight seconds of background usage, Plaintiffs seek to curb the First Amendment rights of the creators who develop original programming.  As an expressive work afforded broad First Amendment protections, *Messiah*'s artistically relevant use of Plaintiffs' logos should be unassailable under First Amendment jurisprudence, including *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir. 1989) and *University of Alabama Board of Trustees v. New Life Art, Inc.*, 683 F.3d 1266, 1278 (11th Cir. 2012).  [*See* D.E. 27.]  To hold otherwise would alter the protections afforded creative works in the United States.  Further, Plaintiffs are government contractors performing the public, front-page function of detaining immigrants.  As the Supreme Court has noted, public figures – like Plaintiffs – are held to an extremely high standard under defamation law due to the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly

sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Plaintiffs chose to bring this action. To now allow them to dictate the scope of their public scrutiny would undermine that "profound national commitment."

*Second*, the amount in controversy here is substantial. While Netflix vehemently disagrees with Plaintiffs' purported and wholly unsubstantiated valuations, Plaintiffs claim to have suffered "not less than $50 million in compensatory damages for the loss of reputation." (Ex. G at 6.)

*Third*, Netflix does not have access to internal documents or complaints concerning the alleged or actual conditions at Plaintiffs' facilities. Government reports indicate that Plaintiffs have conducted internal audits of their facilities that deeply undermine their supposed commitment to respecting the human rights of detainees in their custody. (*See, e.g.*, U.S. H.R., *Deaths and Deficient Medical Care by For-Profit Detention Contractors* (Sept. 2020) at 17 ("In 2019, GEO Group audited the [Aurora] facility again and found that many of those serious issues with the facility remained. GEO Group's 2019 audit . . . determined that many deficiencies that had been categorized in the previous audit as a 'serious life safety' issue or one that 'indicates the existence of a systemic failure' were not resolved.").) And based on the findings from these publicly available reports, Netflix has strong reason to believe that Plaintiffs have received a bevy of complaints from detainees regarding the conditions at Plaintiffs' facilities that speak directly to the veracity of Netflix's allegedly false statements. Plaintiffs cannot hide behind a blanket description of their "reputation" and "facilities" when even if the conditions at one facility proved the truth or substantial truth of the alleged "statements", Plaintiffs' claims fail for yet another reason. But without compelling Plaintiffs to produce those documents in discovery, those complaints will never see the light of day.

*Fourth*, Plaintiffs have ample resources to produce the requested documents. As a for-

profit private prison company, GEO Group reported over $2.4 billion in 2019 revenues resulting in over $160 million in net income.  Plaintiffs instituted this action and should be prepared to bear the associated costs.

*Fifth*, the Requested Information is crucial to resolving the issues in this case, including whether Netflix's alleged statements were actually false, whether Netflix "should have known" about Plaintiffs' reputation, the factors that form Plaintiffs' reputation as well as determining the value of Plaintiffs' reputation and goodwill.  (*Supra* § 1.)  Without these documents, the Court will be left with a one-sided, curated and artificial view of the actual conditions at Plaintiffs' facilities, such as the staged photos of unidentified and uninhabited facilities placed into their Complaint. [*See, e.g.*, D.E. 1  ¶¶ 2, 17-20.]   The Requested Information will aid in resolving this issue.

*Sixth*, the burden or expense of the Requested Information does not outweigh its likely benefit.  There should be little burden to producing the Requested Information as the Requests seek largely internal GEO documents that are already in Plaintiffs' custody or control.  Moreover, despite being the party that must prove burden, Plaintiffs have not objected on burden grounds, much less put forth any evidence to establish the argument.  *See, e.g.*, *DeLeon-Reyes v. Guevara*, 1:18-CV-01028, 2020 WL 3050230, at *5 (N.D. Ill. June 8, 2020) (The objecting party "failed to provide detailed information regarding the burdens it would suffer . . . That is not the way to address proportionality concerns. Instead, an objecting party must specifically establish the nature of any alleged burden, usually by affidavit or other reliable evidence.") (internal quotation omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, Netflix respectfully requests that this Court set aside the Discovery Order to the extent it denied Netflix's Requests and compel Plaintiffs to comply with their discovery obligations.

Dated: April 27, 2021

**PRYOR CASHMAN LLP**
*Attorneys for Netflix, Inc.*
Ilene S. Farkas (admitted *pro hac vice*)
James G. Sammataro
Michael B. Adelman (admitted *pro hac vice*)
201 South Biscayne Boulevard, Suite 2700
Miami, Florida 33131
Telephone: (786) 582-3011
Facsimile:  (786) 582-3004

*s/ James G. Sammataro*
Florida Bar No. 520292

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on April 27, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send Notices of Electronic Filing to all counsel of record.

*s/ James G. Sammataro*
James G. Sammataro
